553 So.2d 1227 (1989)
CITY COMMISSION OF the CITY OF MIAMI, et al., Petitioners,
v.
WOODLAWN PARK CEMETERY COMPANY, Respondent.
No. 86-2376.
District Court of Appeal of Florida, Third District.
August 1, 1989.
Rehearing Denied December 6, 1989.
Lucia A. Dougherty, City Atty., and Joel E. Maxwell, Asst. City Atty., for petitioners.
Mershon, Sawyer, Johnston, Dunwody & Cole, and William J. Dunaj and Philip A. Allen, III and Teresa Ragatz, Miami, for respondent.
Robert D. Korner, Miami, for intervenors.
Before HUBBART, FERGUSON and JORGENSON, JJ.
HUBBART, Judge.
This is a petition for a writ of certiorari filed by the City of Miami and certain intervenors which seeks review of a final order of the circuit court sitting in its appellate review capacity in a zoning matter. The circuit court order under review requires, in effect, the City of Miami to rezone from residential to commercial a small parcel of a large historic cemetery in Miami. We find no legal basis to upset this order and, accordingly, deny the petition for a writ of certiorari.

I
The relevant facts of this case are, for the most part, entirely undisputed. As revealed by the record, they are as follows.

A
Woodlawn Park Cemetery [Woodlawn] is an historic sixty-eight-acre cemetery located within the City of Miami. It was chartered in 1913 and is the burial place of over 60,000 persons, including many of Miami's most prominent pioneer families; there are also countless other persons of national and international renown buried there. It contains the oldest Jewish cemetery in *1228 Dade County, as well as the county's oldest Greek, Chinese, Cuban, Roman Catholic and Masonic burial sections. It currently serves all sectors of the ethnically diverse Miami community and is the only cemetery in Miami with available burial space. Moreover, the cemetery is a bird sanctuary and is considered by many to be a beautiful, serene place.
Since at least the 1930's, the subject property has been zoned residential, currently RS-2/2 (general residential), which permits its present and long-standing use as a cemetery. The sixty-eight-acre, entirely fenced cemetery fronts to the north on S.W. 8th Street for approximately 900 feet. Along 229 feet of this frontage is the cemetery entrance, a parking lot, and an office building from which the Woodlawn personnel have conducted the business of the cemetery for over fifty years. S.W. 8th Street  although once a sleepy, residentially zoned country road which was commercially undeveloped on either side  is now a busy, rezoned, four-lane major thoroughfare in Miami which passes through many miles of continuous commercial development with abutting residential communities located to the immediate rear of such development. Indeed, with the sole exception of Woodlawn's 900-foot cemetery frontage, virtually every parcel of property bordering S.W. 8th Street in Miami, with abutting single-family residences to the rear, has been rezoned from residential to commercial use. In the immediate area itself, across S.W. 8th Street from Woodlawn's property to the north and extending for over a city block on either side, is a wide variety of commercial establishments, including: a motel, a restaurant, a travel agency, a dental lab, a print shop, a shopping center, a gas station, a car stereo shop, a garage, an auto rental business, a flower shop, an antique shop, a used car lot, and a donut shop. To the immediate east and west of Woodlawn's cemetery on the south side of S.W. 8th Street where the cemetery is located are similar-type commercial establishments, including: a used car lot, a restaurant, a tire store, and, most significantly, the Rivero Funeral Home, which is located in the adjoining block to the west, approximately 600 feet from Woodlawn Cemetery. Moreover, up and down S.W. 8th Street for miles in either direction of the cemetery is heavy commercial development of the same general nature as that in the immediate vicinity of the cemetery.
The rest of the Woodlawn cemetery, like much of the commercially zoned property along S.W. 8th Street, largely abuts single-family homes which are zoned residential. The cemetery extends eight blocks deep on either side of its frontage in a southerly direction from S.W. 8th Street to S.W. 16th Street, forming a large, slightly misshapen, rectangular parcel of land. It is bordered on the east by S.W. 32nd Avenue which intersects S.W. 8th Street, the west by S.W. 33rd and 34th Avenues which also intersect S.W. 8th Street, and the south by S.W. 16th Street  all noncommercial streets largely bordering single-family residences. The cemetery has a main entrance and exit on S.W. 8th Street; it also has its own internal road system which provides additional ingress and egress at S.W. 16th Street and S.W. 34th Avenue, both streets with single-family residences thereon. In this respect, the cemetery is no different from virtually all the commercial properties along S.W. 8th Street which also abut single family residences to their immediate rear and are connected thereto by an extensive public road system.[1]

B
On April 12, 1985, Woodlawn Park Cemetery Company filed an application with the City of Miami seeking to rezone a portion *1229 of its cemetery from a residential to a commercial classification. The requested rezoning sought to change only a 1.3-acre parcel of its sixty-eight-acre cemetery in order to build a 14,000 square foot funeral home thereon with eighty-one, on-site parking places  far more than the available parking spaces for other funeral homes in the area. The subject 1.3-acre parcel fronts on S.W. 8th Street along 229 feet of the cemetery's 900-foot frontage and is otherwise completely surrounded by cemetery property. It is located 285 feet to the east and 393 feet to the west of the nearest adjoining property, and it is eight blocks north of the residential area located to the immediate rear of the cemetery.[2] Woodlawn's administrative office building and parking lot are currently located on the subject parcel and have been for the last fifty years.
The City of Miami Zoning Board held a public hearing on the proposed zoning change. Mr. Richard Whipple of the City of Miami Zoning Department reported that his department recommended approval of the rezoning based on the department's study that the rezoning would not have an adverse effect on the surrounding area. Woodlawn then called a number of witnesses who explained the details of the proposed funeral home, the projected number of funerals at the proposed home over a five-year period, and two surveys prepared by Woodlawn's experts concerning the traffic and noise impact these funerals would have on the surrounding area. It was shown that (a) for the past year there were approximately four internments per day at Woodlawn with an average of fifteen vehicles per procession;[3] (b) if the proposed funeral home were built, after a five-year period, the average number of funeral processions would, at most, be increased by one procession of fifteen additional vehicles[4] per day  most of which vehicles, based on past experience, would not use the residential exits to the cemetery but, instead, would enter and exit from and onto S.W. 8th Street; and (c) the noise impact of these additional funerals would be negligible. The only opposition to the rezoning request consisted of representatives from four nearby funeral homes which would compete with Woodlawn, several local residents, and an attorney for the competing funeral home directors. These witnesses expressed generalized concerns about the possible traffic impact of the proposed funeral home, but presented no studies or other empirical data in opposition to Woodlawn's traffic and noise studies. The funeral home witnesses also expressed other concerns about alleged decreased burial *1230 sites, and "breaking faith" with present grave owners. At the end of the hearing, the Zoning Board voted six to two to override the zoning department's recommendation and recommended to the City Commission that the rezoning application be denied. The City Commission, based on much the same showing as was made before the Zoning Board, approved this recommendation by a vote of three to zero and denied the requested rezoning.[5]
Woodlawn then sought certiorari review of the City Commission's action in the circuit court. The circuit court granted the requested review, quashed the city's zoning decision, and enjoined the city from enacting, maintaining, or enforcing any zoning classification on the subject parcel more restrictive than CR-2/4 [commercial]. The circuit court held, in effect, that the city abused its discretion by arbitrarily and capriciously denying Woodlawn its constitutionally guaranteed right to make reasonable use of its property in accord with the character of the adjacent area. The court concluded that the refusal to grant the requested rezoning constituted "reverse spot zoning" because all property fronting S.W. 8th Street for miles in either direction is currently zoned for commercial purposes, except for the subject Woodlawn property. This petition for a writ of certiorari follows.

II
It is well settled in Florida that a zoning restriction must meet the constitutional test of being within the police power of the governing authority to enact or enforce, i.e., the restriction must bear a substantial relationship to the public health, welfare, safety, and morals of the community.[6] This police power is admittedly a very broad power entrusted to legislative bodies to exercise, and the courts have traditionally given great deference to legislative decisions in this area. So long as it is "fairly debatable," i.e., open to dispute or controversy on grounds that make sense, whether the zoning restriction advances the public health, welfare, safety, or morals of the community, the subject restriction is considered to be constitutional.[7] Moreover, the burden is not on the governmental authority to establish that the zoning regulation or classification is reasonable or is in furtherance of its police power;[8] the very adoption of the regulation or classification creates a presumption of its validity.[9] Instead, the burden rests on the party challenging the zoning restriction to establish that the subject restriction is arbitrary, unreasonable, or confiscatory and thus not "fairly debatable."[10]
*1231 Notwithstanding the above rules of law which are weighted heavily in favor of sustaining the validity of zoning restrictions, it is clear that the police power to enact or enforce such restrictions is not unlimited. Occasionally, and under very limited circumstances, the Florida courts have intervened and struck down zoning restrictions as being outside the police power of the governing authority to enact or enforce. As the Florida Supreme Court has stated:
"The constitutional right of the owner of property to make legitimate use of his lands may not be curtailed by unreasonable restrictions under the guise of police power. The owner will not be required to sacrifice his rights absent a substantial need for restrictions in the interest of public health, morals, safety or welfare. If the zoning restriction exceeds the bounds of necessity for the public welfare, as, in our opinion, do the restrictions controverted here, they must be stricken as an unconstitutional invasion of property rights."
Burritt v. Harris, 172 So.2d 820, 823 (Fla. 1965) (footnotes omitted).
One of the very limited circumstances where the Florida courts have intervened and struck down zoning restrictions as not being a "fairly debatable" use of the police power is represented by a class of cases, often referred to as "reverse spot zoning" cases, where the governing authority persists in enforcing a long-ago imposed zoning restriction against a property owner  although it has since rezoned most of the adjoining area and relieved virtually all property owners therein of the same zoning restriction, thereby resulting in a transformation in the character of the subject area. For example, in the leading case of Tollius v. City of Miami, 96 So.2d 122 (Fla. 1957), the appellant owned several lots on S.W. 25th Road and U.S. 1 near the Rickenbacker Causeway in Miami. In 1936, the property was zoned for single-family residences. Since then, however, over a period of twenty years, the zoning in the neighboring area was changed from residential to commercial, the streets in the area were widened, the traffic thereon became quite heavy, and the area was built up commercially. Appellant sought to rezone his property, like the neighboring properties, from residential to commercial so as to build an apartment-motel thereon. The rezoning request was denied by the City of Miami, and the circuit court denied relief upon review. The Florida Supreme Court reversed and stated:
"The block in which appellant's property lies is a `veritable island,' to borrow a term from appellant's brief. It is surrounded by highways or streets of four or more lanes in width. The south half of the block is owned by the county while that part of the north half lying west of the property in question is also owned by the appellant.
Aside from the characteristics of the land, and the land around it, apparent from the sketch, there was abundant testimony that the property in litigation no longer retained the features which at the time of passage of the zoning ordinance justified classifying it as a site usable only for one purpose.
... .
There must be a substantial and reasonable relationship between the need for zoning restrictions and the public health, morals, safety or welfare to justify interference, by exercise of the police power, with an owner's right to the enjoyment of his property. Only in the presence of such necessity will he be required to make a personal sacrifice for the good of the people. City of Miami Beach v. Lachman, Fla., 71 So.2d 148.
It may be that when the zoning ordinance was passed this need existed and the legislative act could not have been defeated or thwarted because then it could have been fairly debated. But the need twenty years later seems to have been so dissipated by the intervening phenomenal growth of the City of Miami *1232 that it is now so out of proportion to the interference with the use of the appellant's property that the exercise of the police power cannot be upheld."
Id. at 125, 125-26.
Similarly, in Kugel v. City of Miami Beach, 206 So.2d 282 (Fla. 3d DCA), cert. denied, 212 So.2d 877 (Fla. 1968), cert. denied, 393 U.S. 1021, 89 S.Ct. 629, 21 L.Ed.2d 565 (1969), the appellant owned a lot at the corner of 17th Street and Meridian Avenue in Miami Beach. In 1952, the property was zoned residential for multifamily residences at a time when "the 17th Street neighborhood was quiet and relatively secluded." Id. at 284. Since then, however, over a period of fifteen years, the zoning in the neighboring area was changed from residential to commercial, the area became built up commercially, and the traffic flow in the vicinity increased considerably; 17th Street became a major thoroughfare and the City of Miami Beach built a convention complex on the adjoining property. Appellant sought to rezone his property from residential to commercial, like all the neighboring property in the area. The City of Miami Beach denied this application, and the circuit court denied relief upon review. This court reversed and stated:
"Appellants' property has a 62-1/2 foot frontage on the west side of Meridian Avenue and 150 feet on the north side of 17th Street, Miami Beach, Florida. When the present zoning classification was changed from single family to multiple family residence in 1952, the 17th Street neighborhood was quiet and relatively secluded. Since that time the City of Miami Beach has built a large auditorium and convention facility upon a neighboring land which is zoned for residential use. This complex is just east of appellants' property. In addition, the City has closed Lincoln Road (16th Street), which was a main thoroughfare. The result is that 17th Street has become one of the main east-west thoroughfares in the City. Further, by a change in the zoning laws, the City has allowed a federal savings and loan association to build an office building on the corner immediately across Meridian Avenue from appellants' property. The office building is on property zoned residential but is used for business. The changes in the area have resulted in a large concentration of non-residential activity in a residential area.
Where changed conditions create a situation where the zoning of appellants' property is so unreasonable as to constitute a taking of his property, then the courts are justified in striking down the arbitrary zoning classification.
... .
We hold that the zoning of appellants' property is arbitrary and unreasonable and the same amounts to confiscatory regulation of appellants' property."
Id. at 284.
Further, in Manilow v. City of Miami Beach, 213 So.2d 589 (Fla. 3d DCA 1968), cert. discharged, 226 So.2d 805 (Fla. 1969), cert. denied, 397 U.S. 972, 90 S.Ct. 1088, 25 L.Ed.2d 266 (1970), appellant owned several lots on the corner of Arthur Godfrey Road and Pine Tree Drive in Miami Beach. In 1930, the property was zoned for single-family residences. Since then, however, over a period of thirty-six years, the zoning in the neighboring area was changed from residential to commercial, the area was transformed into a commercial area, and the traffic in the vicinity greatly increased due to a widening of the nearby streets and the opening of the Julia Tuttle Causeway. The appellant sought to rezone his property from residential to commercial, like the neighboring property. The City of Miami Beach denied this request and the circuit court denied relief upon review. This court reversed and stated:
"The property is then, except for the northernmost part, similar to the `veritable island' with which the Supreme Court of Florida was faced in Tollius v. City of Miami.
... .
The factual situation herein is quite similar to that of Kugel v. City of Miami Beach, where this court stated that `the changes in the area have resulted in a large concentration of non-residential activity *1233 in a residential area' and `that the character of the property has already been changed by other actions of a municipality.'
... .
The rationale applied in Kugel, supra, appears to be appropriate here. To deny the relief sought herein, as in Kugel, would constitute spot zoning in reverse."
Id. at 592-93 (citations omitted).
Finally, in Olive v. City of Jacksonville, 328 So.2d 854 (Fla. 1st DCA 1976), the appellant owned a single-family residence on a lot in Jacksonville. In 1948, when the house was built, his lot was zoned residential; since then, however, over a period of twenty-five years, the character of the adjoining area changed and appellant's property became surrounded on three sides by commercially rezoned property. The appellant sought to rezone his property to a commercial use, and the City of Jacksonville denied this rezoning request. The circuit court granted relief in part, and the First District, on appeal, reversed and granted complete relief to a commercial classification. The court stated:
"While imposition of CPO zoning classification upon appellants' property does not render it a `veritable island' as described in Tollius v. City of Miami, Sup.Ct.Fla. 1957, 96 So.2d 122, it does render the subject property a literal peninsula.
To deny appellants the zoning classification sought (which is more restrictive and permits a less intensive use than that to which they are entitled but did not request) would constitute spot zoning in reverse (Kugel v. City of Miami Beach, supra)."
328 So.2d at 856.
Running through all of these cases is the court's determination that it is entirely arbitrary and not at all "fairly debatable" on grounds that make sense for the governing authority to allow for an entire transformation of the character of an area through extensive rezoning of all nearby properties  and then to deny the subject property owner equal treatment, although similarly situated. It is thought to be confiscatory of a person's property in such cases to prevent a property owner from utilizing his property in a certain way, when virtually all of his adjoining neighbors are not subject to such a restriction. Often, as previously noted, the courts refer to such arbitrary refusals to rezone as "reverse spot zoning" because the refusal to rezone the subject property creates, in effect, a veritable zoning island [as in Tollius], or a zoning peninsula [as in Manilow and Olive], in a surrounding sea of contrary zoning classification. In these cases, the courts have reasoned that a governing authority, although having large discretionary zoning power, may not, under the guise of its police power, discriminate in such a blatant fashion against a property owner  as such arbitrary governmental action violates the property owner's constitutional right to make legitimate use of his land.

III

A
Turning to the instant case, we have no trouble in concluding that the circuit court afforded the petitioners procedural due process and applied the correct law, as stated above, in striking down the City of Miami's refusal to rezone the 1.3-acre parcel of Woodlawn's sixty-eight acre cemetery; indeed, the petitioners make no serious contention to the contrary. Due process requirements were scrupulously afforded to all parties below, and the circuit court correctly stated in its decision the controlling principles of zoning law applicable to this case. This being so, it is plain that there is no legal basis whatever to upset the circuit court's decision below under our admittedly narrow scope of certiorari review. Educational Dev. Center, Inc. v. West Palm Beach Bd. of Zoning Appeals, 541 So.2d 106 (Fla. 1989); City of Deerfield Beach v. Vaillant, 419 So.2d 624 (Fla. 1982).
The petitioners contend, however, that the circuit court, in effect, misapplied the correct zoning law to reach its result below because it misunderstood the nature of this law, particularly as it relates to the "fairly debatable" rule and the legal concept of *1234 "reverse spot zoning"; Judge Ferguson, in dissent, makes much the same argument. We seriously doubt that we have the authority to review whether the circuit court mistakenly applied established zoning principles to the facts of the instant case [thereby demonstrating a judicial misunderstanding of these principles], as this comes dangerously close to a full plenary appeal of the circuit court's administrative review decision below  a plenary appeal which the Florida Supreme Court has held we have no jurisdiction to entertain. City of Deerfield Beach v. Vaillant. On the off chance, however, that we somehow have the authority to decide on this certiorari petition whether the circuit court "misunderstood" or "misapplied" the established zoning law below, we turn now to a consideration of this issue.

B
We have no trouble in concluding that the circuit court correctly understood and correctly applied the above-stated zoning law when it struck down the City of Miami's refusal to rezone the 1.3-acre parcel of Woodlawn's sixty-six-acre cemetery. This is so because the result of the City's refusal to rezone, as the circuit court properly held, constitutes a classic case of "reverse spot zoning" within the meaning of the Tollius-Kugel-Manilow-Olive line of cases  which, as these cases hold, is an arbitrary and not a "fairly debatable" use of the City's police power.
In the 1930's, when the subject 1.3-acre parcel was first zoned residential, S.W. 8th Street on which the parcel fronts was a sleepy, commercially undeveloped country road in what was then a very small town of Miami. Since then, over the intervening fifty years, the character of the neighboring area on S.W. 8th Street has been totally transformed into a commercial area due to the phenomenal intervening development of Miami. Now the subject Woodlawn parcel is the only property in the adjoining area facing S.W. 8th Street which is currently zoned residential; all else has been rezoned from residential to commercial and is heavily built up on the north, east and west of the property with a variety of businesses, including a funeral home one block to the west. As a result, this property now stands out in stark contrast as a "literal zoning peninsula," Olive, Manilow, not only to the rest of the immediate area, but to the entire commercial character of S.W. 8th Street. Moreover, S.W. 8th Street, Tamiami Trail, is currently a heavily traveled, four-lane, major thoroughfare in Miami which is commercially developed on both sides of the street for miles in either direction of the Woodlawn parcel.
One can scarcely imagine a more striking parallel with the above "reverse spot zoning" cases. First, the instant case and the above line of cases all involve a transformation, over a relatively long period of time, in the character of the area surrounding the subject parcel caused by extensive intervening rezonings, commercial development, and traffic build up  so that the area is no longer purely residential in nature, but is now largely commercial. Such dramatic changes in the area result "in a large concentration of nonresidential activity in a residential area." Kugel, 206 So.2d at 284. Second, the instant case and the above line of cases all involve adjoining property rezonings of such a nature that the subject parcel becomes, in effect, a "veritable island," as in Tollius, or a "literal peninsula," as in Olive, Manilow and here, of residential zoning in a surrounding sea of otherwise commercial rezonings. Moreover, the fact that Woodlawn in the instant case seeks only to rezone a small portion of its sixty-eight-acre cemetery does not, contrary to the petitioner's arguments, convert its "literal zoning peninsula" of residentially zoned property  surrounded to the north, east, and west of it on S.W. 8th Street with commercially rezoned property  into property "surrounded" by its own property.
It is clear that in the instant case, as in the above cases, the aforesaid "changed conditions create a situation where the zoning of [the landowner's] property is so unreasonable as to constitute a taking of his property,"  "a confiscatory regulation of [his] property,"  so that "the courts are justified in striking down the arbitrary zoning *1235 classification." Kugel, 206 So.2d at 284. To paraphrase what the Florida Supreme Court stated in Tollius, "[i]t may be that when the zoning ordinance was passed" creating the residential zoning on Woodlawn's parcel that such zoning "could not have been defeated or thwarted because then it could have been fairly debated. But the need [fifty] years later [for such zoning] seems to have been so dissipated by the intervening phenomenal growth of the City of Miami that it is now so out of proportion to the interference with the use of [Woodlawn's] property that the exercise of the police power cannot be upheld." 96 So.2d at 126 (citation omitted).
Central to the analysis of a reverse spot zoning case, as previously noted, is that the land of the complaining landowner must be treated unjustifiably different for zoning purposes than that of the land which surrounds it. In the instant case, there was no competent, substantial evidence adduced before the Zoning Board or City Commission establishing a justifiable reason as to why the Woodlawn parcel was treated differently for zoning purposes from all its similarly situated, commercial neighbors on S.W. 8th Street. Plainly, as the circuit court correctly concluded, Woodlawn was denied precisely the same commercial zoning as that of its surrounding commercial neighbors on a purely arbitrary basis, and consequently, the subject denial was unlawful as discriminatory reverse spot zoning.
Woodlawn's complaint, then, is not that the present residential zoning "denies it the right to make maximum profitable use of [its] land," at 1241, as the dissent suggests. Its complaint is that it has been arbitrarily discriminated against by the City of Miami so that it cannot make use of its land for the same commercial purposes as that enjoyed by its adjoining commercial neighbors. Such rank discrimination constitutes, in effect, an unreasonable restriction on Woodlawn's use of its property, thereby amounting to a partial taking thereof  and, therefore, falls squarely within the holdings and rationale of the Tollius-Kugel-Manilow-Olive line of reverse spot zoning cases.

1
To avoid, however, this inevitable result, the petitioners make one central argument. It is urged that substantial competent evidence was adduced before the Zoning Board and City Commission to support a finding that the requested rezoning with its proposed funeral home would have an adverse traffic impact on the homes located to the immediate south of Woodlawn's rezoning parcel on S.W. 8th Street. From this, the petitioners reason that the city's refusal to rezone the Woodlawn parcel is sustainable as being a "fairly debatable" use of the city's police power to protect the integrity of a residential neighborhood.
This court, however, has persuasively rejected this argument in Kugel v. City of Miami Beach, 206 So.2d 282 (Fla. 3d DCA), cert. denied, 212 So.2d 877 (Fla. 1968), cert. denied, 393 U.S. 1021, 89 S.Ct. 629, 21 L.Ed.2d 565 (1969), a reverse spot zoning case, in which we held that a property owner was constitutionally entitled to have the zoning on his property changed from residential to commercial, given the long-term commercial rezoning of the surrounding properties in the area, notwithstanding a traffic impact which the rezoning would have on nearby homes. This court stated:
"Appellee also suggests that this Court should treat the residential zoning of appellants' property as an exercise of the legislative authority of the city council, and that as such, it falls under the fairly debatable rule adhered to by this Court in the City of Miami v. Zorovich, Fla.App. 1967, 195 So.2d 31. In that case, we held that zoning regulations which promote the integrity of a neighborhood and preserve its residential character are related to general welfare of the community and are a valid exercise of the legislative power. The present case does not come within the bounds of this rule because the record clearly reveals that to change the residential zoning of appellants' property will in no way act to destroy the integrity of a neighborhood. The character of the property has already been changed by other actions of the municipality. The zoning regulation *1236 in question, as applied to appellants' property, is arbitrary and unreasonable and cannot be characterized as `fairly debatable.'"
Id. at 285 (emphasis added) (citations omitted).
Similarly, the fatal flaw in the traffic impact argument advanced in this case is that the increased traffic caused by Woodlawn's rezoning request would not, as urged, destroy the integrity of a residential neighborhood. This is so because, as in Kugel, the character of the area in which homes are located to the south of S.W. 8th Street, including Woodlawn's proposed rezoning parcel, has already been changed by the City of Miami through widespread commercial rezonings on S.W. 8th Street over the past fifty years. Clearly, this area is no longer a pristine residential neighborhood; it is now a mixed commercial-residential development which Woodlawn's rezoning request would in no way alter. Indeed, the entire commercial development along S.W. 8th Street, the widening of S.W. 8th Street with a consequent traffic buildup thereon, and the entire transformation of most of the area from residential to commercial over the past fifty years  has had a devastating traffic impact on the homes in this mixed area, all of which have direct street access to the rezoned commercial properties on S.W. 8th Street.[11] This being so, it is no longer a "fairly debatable" use of its police power for the city to deny Woodlawn's rezoning request on the ground that it must protect the integrity of a residential neighborhood from an adverse traffic impact  when its pervasive commercial rezonings along S.W. 8th Street have already destroyed the integrity of this former neighborhood, so that it is now a mixed commercial-residential area.
In this connection, we agree entirely with the circuit court's reasoning in the order under review:
"It is conceded that Southwest Eighth Street is already heavily commercial in nature and no evidence was offered to show that the requested rezoning would contribute any greater or different kind of noise or traffic than the existing businesses and funeral homes on Eighth Street, including the existing funeral home on the same block. The testimony relied on by the [c]ity and [i]ntervenors, even if it is accepted as authoritative and reliable, establishes only that Woodlawn will contribute incrementally to the commercial activity that already exists in this commercial area. A zoning authority may not deny rezoning on traffic and related grounds when its zoning scheme already permits other area land owners to make comparable contributions to the area's traffic environment through commercial use of the land. City of Clearwater v. College Properties, Inc., supra [239 So.2d 515] at 517. (1970)
... .
While a reviewing [c]ourt is not entitled to substitute its judgment for that of the zoning authority, a zoning restriction must be set aside when it deprives a property owner of his constitutional right to use his property. On the record before this [c]ourt it is clear that the parcel faces a busy commercial thoroughfare already bristling with commercial activity. While the [c]ity may enact zoning restrictions to create and preserve residential zones free from commercial activity, it may not constitutionally refuse to permit a commercial use of land in an area permeated by commercial activity. The instant zoning restriction constitutes reverse spot zoning."

2
Secondarily, the petitioners argue, in effect, that there is an aesthetic reason for denying Woodlawn's rezoning request, namely, that to introduce a funeral home into Woodlawn Park Cemetery would be detrimental to the pristine quality of this historic cemetery; it is further urged that building a funeral home on the subject parcel would deprive the City of Miami of *1237 needed burial sites. Neither argument has any merit.
It is, of course, true that Woodlawn is an historic cemetery founded in 1913 which, to this day, serves well the burial needs of Miami's multi-ethnic community; that it is a bird sanctuary in a sea of commercial development; and that it is considered by many to be a beautiful and serene place. Woodlawn's zoning request, however, threatens none of these practical and aesthetic values. The request involves only a 1.3-acre parcel of this sixty-eight-acre cemetery, which parcel has never been dedicated for burial sites; indeed, the subject parcel has housed Woodlawn's administrative offices for the last fifty years. It therefore cannot be said that the zoning request will deprive the Miami community of needed burial sites. Moreover, the proposal to build a quiet funeral home on the subject parcel hardly compromises the beauty and serenity of the cemetery  anymore than does the funeral home located in the adjoining block. A funeral home is fully in keeping with the sacred nature of the cemetery, and its placement on a 1.3-acre parcel presently housing administrative offices obviously leaves the 66.7-acre balance of the existing cemetery entirely intact. If anything, allowing Woodlawn to make a modest additional economic use of its property may increase, not diminish the prospects that it will continue to maintain the cemetery as the serene and beautiful place which it is to many. Obviously, a different issue would be presented if Woodlawn had sought to rezone the entire cemetery or a significant part thereof; no such request, however, has been made in this case.
For the above-stated reasons, the petition for a writ of certiorari is
Denied.
JORGENSON, J., concurs.
FERGUSON, Judge (dissenting).
Judge Hubbart's opinion for the majority is characteristically thorough on the facts. There is no disagreement on the relevant facts which I will briefly restate. I respectfully dissent because the majority has misapplied the law.

RELEVANT FACTS
The zoning authority, in denying Woodlawn's application for rezoning, found that the proposed funeral home would increase traffic flow through the surrounding residential community. Woodlawn's plan, reproduced below, reflects the size of the proposed building in comparison to adjacent buildings, and that it will be necessary to route traffic through neighboring communities several blocks south and west of its premises for funeral services.
*1238 
*1239 Although there was disagreement before the zoning body concerning the extent of an increased traffic flow and the degree of detrimental impact, the finding that funeral services at Woodlawn would, over the years, substantially increase the flow of vehicular traffic through residential neighborhoods south of the commercial strip is supported by competent and substantial evidence, presented by experts, and is not disputed here. On a related question, there is no contention or showing that Woodlawn no longer makes profitable commercial use of its land as it has done for over fifty years.

STANDARD OF REVIEW
There are three components to a circuit court's certiorari review of a zoning decision: whether procedural due process was accorded, whether the essential requirements of the law have been observed, and whether the administrative findings and judgment are supported by competent substantial evidence. In the course of that review the circuit court is not permitted to reweigh the evidence nor to substitute its judgment for that of the zoning body. Education Dev. Center, Inc. v. City of West Palm Beach Bd. of Zoning Appeals, 541 So.2d 106 (Fla. 1989). In review of a zoning decision the circuit court must accord it presumptive validity and not interfere with the legislative action if it is fairly debatable. Dade County v. United Resources, Inc., 374 So.2d 1046 (Fla. 3d DCA 1979). An ordinance is fairly debatable when for any reason it is open to dispute or controversy on grounds that make sense or point to a logical deduction that in no way involves its constitutional validity. City of Miami Beach v. Lachman, 71 So.2d 148, 152 (Fla. 1953), appeal dismissed, 348 U.S. 906, 75 S.Ct. 292, 99 L.Ed. 711 (1955).

LEGAL ISSUES
Our single inquiry on this point is, thus, only legal in nature: Whether the basis for denying the zoning action bears a substantial relation to the public safety, health, morals, or general welfare. We answered that question in Town of Bay Harbor Islands v. Driggs, 522 So.2d 912 (Fla. 3d DCA) rev. denied, 531 So.2d 1352 (Fla. 1988), holding that a municipality properly exercises its police powers in promoting the safety, health, and welfare of its citizens when it controls vehicular traffic in certain areas to prevent congestion. See also City of Tampa v. Seth, 517 So.2d 786 (Fla. 2d DCA 1988) (city did not act arbitrarily in denying a zoning change out of consideration for the character of the surrounding neighborhood and the adverse impact to be caused it by increased traffic).
In Town of Bay Harbor Islands, we also answered a separate issue raised in this appeal, holding, on well-settled principles, that "a zoning ordinance which denies an owner maximum profitable use of his land is not unconstitutionally confiscatory."[1]
Zoning is an exercise of legislative power to which a reviewing court applies a deferential "fairly debatable" test, Machado v. Musgrove, 519 So.2d 629, 632 (Fla. 3d DCA) (en banc), rev. denied, 529 So.2d 694 (Fla. 1988), meaning that a zoning ordinance will be upheld unless the party challenging the zoning action shows that the ordinance is clearly arbitrary, unreasonable and without substantial relation to the public safety, health, morals or general welfare. Dade County v. Inversiones Rafamar, S.A., 360 So.2d 1130 (Fla. 3d DCA 1978). The circuit court may not reweigh the evidence or substitute its judgment for that of the local zoning authority where the evidence before the zoning body supports its legislative decision. Skaggs-Albertson's v. ABC Liquors, Inc., 363 So.2d 1082 (Fla. 1978).
In another landmark case, Schauer v. City of Miami Beach, 112 So.2d 838, 840 (Fla. 1959), the Florida supreme court, approving the language of this court in a zoning case, wrote:
[W]henever an act of the legislature is challenged in court the inquiry is limited to the question of power, and does not extend to the matter of expediency, the *1240 motives of the legislators, or the reasons which were spread before them to induce the passage of the act.
Lawmakers' motives  e.g., whether their decision served personal purposes  are beyond the subject of judicial inquiry in an administrative challenge to the exercise of legislative power. Id. at 840.
Significantly, there is no finding by the circuit court of an absence of competent substantial evidence to support the zoning restriction  which is necessary to overturn a decision of a zoning tribunal. City of West Palm Beach Bd. of Zoning Appeals v. Education Dev. Center, Inc., 504 So.2d 1385 (Fla. 4th DCA 1987), cited with approval in Education Dev. Center, Inc. v. City of West Palm Beach Bd. of Zoning Appeals, 541 So.2d 106 (Fla. 1989). The majority's exhaustive examination into the degree of traffic impact is precisely the kind of evidence reweighing by the courts that is prohibited. Skaggs-Albertson's, 363 So.2d at 1091.

REVERSE SPOT ZONING
A theory of illegal "reverse spot zoning" is not applicable to the facts of this case. No Florida court has held that refusal to grant a zoning application for a specific commercial use of a parcel of land, consistent with uses of parcels on three sides, is intrinsically illegal spot zoning. The validity of carving out one or more properties in a given use district and classifying them for a different use depends on the particular facts. For example, a rezoning which creates a small island of property with restrictions on its use different from that of surrounding properties  solely for the benefit of a particular property owner  constitutes illegal spot zoning. On the other hand, singling out a small tract of land for a use restriction different from that of surrounding properties may be upheld where the legislative action is properly related to the public health, safety, morals and general welfare. 101A C.J.S. Zoning & Land Planning, § 44 (1979). See generally 1 R. Anderson, American Law of Zoning §§ 5.12-5.15 (3d ed. 1986). Central to the analysis of a spot zoning question is whether the land is being treated unjustifiably different from similar surrounding land. Schubach v. Silver, 461 Pa. 366, 336 A.2d 328 (1975), cited in 1 R. Anderson, supra, at 361. Florida cases are in accord. See Miles v. Dade County, 260 So.2d 553 (Fla. 3d DCA 1972) (validity of amendatory zoning legislation, in face of spot zoning claim, depends on facts and circumstances of the case).
Critical to the holdings in Tollius v. City of Miami, 96 So.2d 122 (Fla. 1957), Kugel v. City of Miami Beach, 206 So.2d 282 (Fla. 3d DCA), cert. denied, 212 So.2d 877 (Fla. 1968), cert. denied, 393 U.S. 1021, 89 S.Ct. 629, 21 L.Ed.2d 565 (1969), and Manilow v. City of Miami Beach, 213 So.2d 589 (Fla. 3d DCA 1968), cert. discharged 226 So.2d 805 (Fla. 1969), cert. denied, 397, U.S. 972, 90 S.Ct. 1088, 25 L.Ed.2d 266 (1970), relied on by the majority, were findings that the applicant's land was "no longer suitable" for the permitted use, or that "changed conditions [had] create[d] a situation where the zoning of appellant's property [was] so unreasonable as to constitute a taking of his property." In Olive v. City of Jacksonville, 328 So.2d 854 (Fla. 1st DCA 1976), also cited by the majority, the subject land was a vacant lot in a changed area no longer suitable for residential use.[2] The Tollius-Kugel-Manilow-Olive rationale does not fit the facts of this case.[3] Woodlawn's complaint, stripped to the core, is *1241 simply that the zoning restriction denies it the right to make maximum profitable use of the land.
In conclusion: (1) Woodlawn has not been deprived of the right to make reasonable commercial use of its land; (2) denial of the zoning request was not for the benefit of a particular landowner; and (3) denial of Woodlawn's application for a funeral business use was justified out of concern for the public safety and general welfare. For these reasons the claim of reverse spot zoning fails.
The circuit court opinion should be quashed as a departure from the essential requirements of the law.
NOTES
[1] North-south avenues and east-west streets directly connect the single-family residences in the area with all the commercial properties on S.W. 8th Street. Traffic to and from such businesses can flow past these homes, and undoubtedly much of it does. Indeed, S.W. 32nd Avenue, which runs north and south to the immediate east of Woodlawn Cemetery, and S.W. 33rd and 34th Avenues, which run north and south to the immediate west of Woodlawn Cemetery  all intersect S.W. 8th Street and the extensive commercial development located thereon, and all lead directly past the subject homes.
[2] As a result, the proposed funeral home is located much further from the residential homes in the area than any of the commercial businesses on S.W. 8th Street because it is entirely buffered by the surrounding fenced cemetery. The circuit court stated below:

"[E]xisting cemetery property buffers the [proposed funeral home] from the nearest homes by more than 285 feet to the west, more than 385 feet to the east, and by more than 8 city blocks to the south. By contrast, other commercially zoned parcels along this stretch of Southwest Eighth Street, including the nearby Rivero Funeral Home, are physically adjacent to area residences." (emphasis added).
The Rivero Funeral Home, mentioned by the court, is located in the block adjoining Woodlawn Park Cemetery, approximately 600 feet to the west of the Woodlawn parcel, on the corner of S.W. 34th Avenue and S.W. 8th Street. Directly abutting the rear of this funeral home are single family residences.
[3] Woodlawn's traffic survey indicates that in 1984 there were 1,280 interments at Woodlawn Cemetery in the 300 days the cemetery was open for interments (R.80); there being no interments on Sundays (R.78). This averages, according to the survey, to four internments per working day  with a maximum of seven such interments per day and a minimum of two. (R.80). The average number of vehicles in each procession, according to the survey, was fifteen  with the largest procession being ninety-six and the smallest being two. (R.80).
[4] The Woodlawn traffic survey estimates that there will be 300 funerals per year at the proposed funeral home after five years of operation  which on a 300-day working year amounts to an average of one funeral a day (R.81); the survey further states that there are fifteen vehicles in the average funeral procession at Woodlawn (R.80). As a consequence, Mr. Kahart Pinder, who prepared Woodlawn's traffic survey, testified before the zoning board that "we will be putting fifteen vehicles [per day] into the cemetery as a result of the funeral home," (App. A-2 at R.342).
[5] Two commissioners recused themselves from this case because they have interests in funeral homes whose businesses would potentially be hurt if the rezoning request were approved.
[6] Ellison v. City of Fort Lauderdale, 183 So.2d 193, 195 (Fla. 1966); State ex rel. S.A. Lynch Corp. v. Danner, 159 Fla. 874, 33 So.2d 45, 47 (1947); Marell v. Hardy, 450 So.2d 1207, 1211 (Fla. 4th DCA 1984).
[7] City of Miami Beach v. Lachman, 71 So.2d 148, 152 (Fla. 1953), appeal dismissed, 348 U.S. 906, 75 S.Ct. 292, 99 L.Ed. 711 (1955); Hillsborough County v. Westshore Realty, Inc., 444 So.2d 25 (Fla. 2d DCA 1983); Dade County v. Yumbo, S.A., 348 So.2d 392 (Fla. 3d DCA), cert. denied, 354 So.2d 988 (Fla. 1977); City of Miami v. Schutte, 262 So.2d 14 (Fla. 3d DCA 1972); Larkins v. Metropolitan Dade County, 237 So.2d 343 (Fla. 3d DCA 1970); Metropolitan Dade County v. Greenlee, 224 So.2d 781 (Fla. 3d DCA 1969); Smith v. City of Miami Beach, 213 So.2d 281 (Fla. 3d DCA 1968), writ discharged, 220 So.2d 624 (Fla. 1969).
[8] Lambros, Inc. v. Town of Ocean Ridge, Fla., 392 So.2d 993, 994 (Fla. 4th DCA 1981); Rural New Town, Inc. v. Palm Beach County, 315 So.2d 478, 480 (Fla. 4th DCA 1975).
[9] Harrell's Candy Kitchen, Inc. v. Sarasota-Manatee Airport Auth., 111 So.2d 439, 443 (Fla. 1959); City of Miami Beach v. Silver, 67 So.2d 646 (Fla. 1953); Dade County v. Inversiones Rafamar, S.A., 360 So.2d 1130, 1132 (Fla. 3d DCA 1978); Rural New Town, Inc. v. Palm Beach County, 315 So.2d 478, 480 (Fla. 4th DCA 1975); County of Brevard v. Woodham, 223 So.2d 344, 348 (Fla. 4th DCA), cert. denied, 229 So.2d 872 (Fla. 1969); see also Lambros, Inc. v. Town of Ocean Ridge, Fla., 392 So.2d 993 (Fla. 4th DCA 1981).
[10] Rural New Town, Inc. v. Palm Beach County, 315 So.2d at 480; City of Miami Beach v. Silver, 67 So.2d at 647; Metropolitan Dade County v. Kanter, 200 So.2d 624, 626 (Fla. 3d DCA), cert. denied, 204 So.2d 329 (Fla. 1967); see City of St. Petersburg v. Aikin, 217 So.2d 315 (Fla. 1968); Dade County v. Beauchamp, 348 So.2d 53, 55 (Fla. 3d DCA 1977), cert. denied, 355 So.2d 512 (Fla. 1978); Neubauer v. Town of Surfside, 181 So.2d 707, 709 (Fla. 3d DCA), cert. denied, 192 So.2d 488 (Fla. 1966); see also Larkins v. Metropolitan Dade County, 237 So.2d 343 (Fla. 3d DCA 1970).
[11] One of the local residents who testified below complained about the amount of traffic impact in the area caused by the nearby Rivero Funeral Home on S.W. 8th Street, and stated "we're not living in a residential zone anymore."
[1] The constitutional challenge to the ordinance, as it affected the plaintiff's individual property rights, was by a suit instituted in the circuit court for declaratory relief.
[2] Another factor which materially distinguishes this case is that, notwithstanding the zoning restriction, Woodlawn is already making commercial use of its property. Unlike the Tollius-Kugel-Manilow cases, there is no suggestion here that a rezoning for any commercial use would have been denied. What was denied in this case was an application for a funeral home use  because of its plan to channel commercial traffic through residential zones.
[3] Olive was not a certiorari review of a legislative action; that case was an appeal from a judgment entered in the landowner's action for injunctive relief challenging a zoning decision as it affected his individual property rights. The trial court held the ordinance discriminatory and confiscatory. The rationale of the appellate court in upholding that finding  consistent with Tollius and Kugel which it cites  is that the restriction on the appellant's property, under the circumstances, was unreasonable.