838 A.2d 718

In re Appeal of REALEN VALLEY FORGE GREENES ASSO-CIATES from the Decision of the Zoning Hearing Board of Upper Merion Township Dated August 13, 1999.

Supreme Court of Pennsylvania.

Argued April 7, 2003.

Decided Dec. 18, 2003.

116

John A. VanLuvanee, Doylestown, Marc B. Kaplin, Blue Bell, and Kevan Francis Hirsch, for Realen Valley Forge Greenes Associates.

Jennifer Walters Brown, Robert Richard Watson and Alan E. Boroff, Blue Bell, for Zoning Bd. of Upper Merion Tp. and Upper Merion Tp.

Tracy Lynn Updike and Thomas L. Wenger, Harrisburg, for Pennsylvania State Assoc. of Tp. Supervisors.

Gregory W. Philips, for Belmont Hills Civic Assoc., et al.

Thomas D. Rees, Norristown, for King of Prussia Chamber of Commerce at Valley Forge.

Before CAPPY, C.J., and CASTILLE, SAYLOR, EAKIN and LAMB, JJ.

### OPINION

Justice LAMB.

We granted allowance of appeal to consider the validity of the agricultural zoning of a tract located in the heart of one of the most highly developed areas in the region, entirely surrounded by an urban landscape, and immediately adjacent to what is currently the world's largest shopping complex at one discrete location: the Court and the Plaza at King of Prussia. We hold that this agricultural zoning, designed to prevent development of the subject property and to "freeze" its substantially undeveloped state for over four decades in order to serve the public interest as "green space", constitutes unlawful "reverse spot zoning" beyond the municipality's proper pow-

ers. Therefore, we reverse the order of the intermediate appellate court upholding the validity of the legislation.

The subject property, located in Upper Merion Township (Township [1]), Montgomery County, is the site of the Valley Forge Golf Club (Golf Club), about 135 acres [2] of landscaped links located at the confluence of the region's primary arterial highways and immediately adjacent to one of the most intensely developed commercial areas in the region. The Golf Club is owned by the Hankin Family Partnership and is the subject of a conditional agreement of sale to Realen Valley Forge Greenes Associates (Realen), Appellant herein. The Township's consulting land planner, John Rahenkamp & Associates, in an analysis of the Golf Club's zoning in June 1984, described the critical location of the property in these terms.

There are six (6) major limited access highways that service the King of Prussia area, four (4) of them actually begin at the [Golf Club] site (Schuylkill Expressway, PA Turnpike, Route 202, County Line Expressway).... The fact that the site is uniquely accessible and is essentially at the hub of

1. Upper Merion Township, located in southwestern Montgomery County, is widely known by its postal designation: King of Prussia. The connection in 1957 of Philadelphia's Schuylkill Expressway to the Pennsylvania Turnpike and U.S. Route 202 at a point in the center of the township provided the impetus for explosive growth. R.R. 30a. One of the first major employers to take advantage of the transportation infrastructure was General Electric Co., which constructed its aerospace research center for more than 3,000 employees on a rezoned AG District tract immediately adjacent to the Golf Club and the Turnpike Interchange. The following is the Township's official "Community Profile":

Upper Merion Township is located in southeastern Pennsylvania, approximately 15 miles from center city Philadelphia. Over the last five decades, Upper Merion has developed into one of the most important 'activity centers' of the region. The township has approximately 27,000 residents, hosts over 60,000 jobs, and offers over 9.5 million square feet of office space. Also located in Upper Merion are Valley Forge National Historic Park and the King of Prussia Mall, the nation's largest shopping mall (ranked by square footage of retail space).

2. The gross tract area of the Golf Club is 135 acres with about 125 acres net of road rights-of-way. The tract perimeter is North Gulph Road, Guthrie Road, West DeKalb Pike, and North Warner Road. No public roads lie within the tract.

such a major road network, places an extremely heavy pressure on the site. Added to this is the reality that there is very little vacant land as a single large parcel in the adjacent Valley Forge Industrial Park, especially with the visibility of the Golf Course site.

R.R. 345a.

The Golf Club opened in the 1920's, several decades before the Township enacted its first zoning regulations. In 1953 the Township created an AG–Agricultural Zoning District (AG District) and so designated a substantial portion of the Township including the Valley Forge Park[3], the Golf Club, and more than 1,500 acres of land surrounding the Club. Uses of land permitted by right in the AG–District, both then and now, are limited to municipal, single-family detached homes and agriculture. Upper Merion Township Zoning Ordinance § 165–10(A)—(D).

Between 1955 and 1990 the vast majority of the properties within the AG District were rezoned to permit intense commercial development. As the trial court here wrote:

[S]ince the date of its creation, portions of the AG district have been rezoned, many to commercial uses, reducing the district to its current parameters containing the golf course and two other properties [a 7.3 acre parcel improved with Pennsylvania Turnpike Interchange No. 24 and its associated highway ramps and toll plaza and a one-half acre parcel improved with a nonconforming residential structure] previously identified. The last such change or reduction in the district's size occurred in 1985 ... with the most significant revisions taking place between 1955 and 1960, when areas including the present Valley Forge Industrial Park, King of

---

3. When created by Act 130 enacted on May 30, 1893, the Valley Forge Park was this Commonwealth's first park. On July 4, 1976 as part of the national bicentennial celebration, President Gerald R. Ford visited the Valley Forge Park and there signed into law the legislation authorizing federal acquisition of the parklands as the Valley Forge National Historical Park; a portion of which is located in the northwestern quadrant of the Township.

Prussia Mall, General Electric, Acme and Valley Forge Convention Center Areas were rezoned.

Trial Ct. slip op. at 6.

The trial court described the properties surrounding the Golf Club, noting that those in the Township were all within the AG District in the early 1950's, and the current state of their zoning and development, in these terms:

Across North Gulph Road lies an area zoned SM–Suburban Metropolitan, within which district there is located a combination of restaurant, hotel, and office uses. Beyond North Warner Road is found an area zoned C–2 Commercial, containing a Home Depot store, a bank, a gas station and a convenience store, and, below DeKalb Pike, within an AR–Administrative Research district, are located a number of office buildings. To the west, as one crosses the boundary line of Upper Merion Township, Delaware (sic) County into Tredyffrin Township, Chester County, there are to be found three different zoning districts, consisting of an HO–Hotel Office district, a P–Professional Office district and the Glenhardie Condominium situate within the OA–Office Apartment district.

Trial Ct. slip op. at 3–4.

On July 13, 1964 the Township governing body enacted Ordinance No. 64–141 which provided that:

The Township has a general plan (here in after [sic] called General Plan) of its parks, playgrounds, recreation areas and facilities which plan has been on file at the office of the Township; and

. . . .

There is hereby located and superimposed . . . a recreation area, being all of the land and appurtenances thereon of the Valley Forge Golf Club, said located generally in the area of the Township . . . the same consisting of approximately 138 acres.

R.R. 255a–256a. The purpose of Ordinance No. 64–141 can be understood only with reference to Sections 1907–1 and 1907–2 of the Act of May 1, 1933, P.L. 103, added by the Act of July 2,

1953, P.L. 354, to the Second Class Township Code, as it then was, 53 P.S. §§ 66907.1 and 66907.2 [4], which authorized the creation of "a general plan of [the township's] parks, recreation areas, and facilities, including those which may have been or may be laid out but not opened." Once such a general plan was created and filed, "[a]ll subdivisions of property thereafter made shall conform thereto." Moreover, for a maximum period of three years:

> No person shall hereafter be entitled to recover any damages for the taking for public use of any buildings or improvements of any kind which may be placed or constructed upon or within the lines of any located park or recreation area after the same shall have been located or ordained by the township supervisors.

Section 1907.2 of the Second Class Township Code, 53 P.S. § 66907.2 (repealed).

Thus, the purpose and effect of Township Ordinance 64–141 was to preclude any further development or improvement of the Golf Club or its facilities for three years. The Golf Club challenged the validity of Ordinance No. 64–141 and the enabling provisions of the Second Class Township Code by complaint in equity and the trial court, in a decision dated January 14, 1966 on the Golf Club's motion for judgment on the pleadings, reported as *Valley Forge Golf Club v. Upper Merion Township*, 39 D. & C.2d 181, 187 (Montg.Cty.1965), held Ordinance No. 64–141 unconstitutional as depriving the Golf Club without compensation of the full enjoyment of its property.

On the failure of its initial legislative action, the Township sought to create public support for a bond issue, the proceeds of which were to be used to acquire the Golf Club property. By ballot question, the Township referred to the electorate in November 1965, the issue of whether to incur $2 Million in debt "for the purpose of providing funds for and toward the acquisition of lands and buildings known as the Valley Forge Golf Club...." R.R. 266a. In a brochure distributed to

4. Repealed by the Act of July 31, 1968, P.L. 805, No. 247.

Township residents, the governing body made the following representations, among others, in support of the proposed acquisition.

The Board unanimously believes it is of utmost importance that the Valley Forge Golf Course remain as a green, open area in Upper Merion Township....

The acquisition of the Golf Course will, by no means, benefit only those who play golf, but is a vital necessity as far as maintaining green areas before the last of our good, green areas is gobbled up. In addition, it is for the welfare of the human being to enjoy natural green areas in view of the ever-increasing jungle of cement and steel all about us.
....

A privately-owned golf club, the course consists of 135 acres of rolling, green property including several buildings.... It is the last major open space, green area—not designated for any type of residential or commercial development—remaining in the 17–square mile township. The township supervisors and local planning commission never have considered the tract for development. The township comprehensive plan, a complete program for orderly community development lists the area as open, green space. Development of the land for other purposes would create a serious imbalance in the township....

The importance of preserving the golf course as open space has been considered officially by the Township since 1959. The first legal action was initiated in July 1964, when the supervisors placed an "overlay" on the course. This legal move was to "freeze" the value of the property so additional improvements after that date could not be charged to township taxpayers in acquiring the tract. It also served as "fair warning" to the owners—present and future—that the supervisors intended to act to acquire the property for public ownership....

The supervisors want to preserve the area as open, green space to prevent unwarranted development which would adversely affect the township....

If the township cannot acquire the course, zoning changes could be sought to permit apartment complexes, industrial construction or possibly a race track. This would result in monumental traffic congestion on our already overburdened local and State highways.

R.R. 263a–265a.

The governing body's campaign was successful and the bond issue was approved by the electorate. The Township created a municipal authority, denominated the Upper Merion—Valley Forge Municipal Authority, pursuant to the Municipal Authorities Act of 1945, the Act of May 2, 1945, P.L. 382, *as amended,* 53 P.S. § 301 *et seq.,* for the purpose of acquiring the Golf Club's lands and operating a public golf course thereon. By resolution of November 4, 1968, the authority resolved to initiate the condemnation. A declaration of taking was filed by the authority two days later on November 6, 1968. The Golf Club responded with the interposition of preliminary objections to the declaration of taking challenging, *inter alia,* the power of the condemnor and the sufficiency of the posted security. By opinion and order entered August 3, 1970, the trial court sustained the Golf Club's objections [5], set aside the declaration of taking, and ordered title to the lands revested in the Golf Club.

The Township, by its municipal authority, perfected an appeal to this Court but then, by Township Resolution No. 70–63 taken November 16, 1970, authorized the solicitor to withdraw the appeal and to "terminate all actions and activities relating to the purchase of the Golf Course by either the

5. Specifically, the court held that the authority/condemnor's bond without surety was an inadequate "naked bond" under the decision of this Court reported as *In re: 203.76 Acres of Land in Franklin Tp., Beaver County,* 431 Pa. 306, 245 A.2d 451 (1968); that the purpose of the condemnation, to acquire an existing private golf facility in order to initiate and operate a public golf facility, was not one for which municipal authorities have been delegated the power of eminent domain; and that the condemnation violated the Municipal Authorities Act prohibition against the exercise of the powers therein described in order to operate a project "which in whole or in part shall duplicate or compete with existing enterprises serving substantially the same purposes. . . ." Section 306A of the Act, 53 P.S. § 306A.

Upper Merion—Valley Forge Municipal Authority or the township." R.R. 280a. The following explanation of this action appears in the minutes of governing body's meeting conducted on November 16, 1970.

> In view of the cost of pursuing the acquisition to the higher courts, the recent court decision and the cost of acquisition, it would not be in the best interest of the Township. *The recent decision of the Courts enables the Board to control the use of the land for open space by zoning.*

*Id.* (emphasis supplied).

During this period, the Golf Club and prospective purchasers thereof initiated the first of a series of requests for a rezoning of the subject lands addressed to the Township governing body. By a "citizen's petition" filed on April 11, 1967, the Golf Club attempted to avail itself of the authority now codified at Zoning Ordinance § 165–260 under which the owners of more than fifty (50%) percent of the lands in a described area may by petition request a modification of the zoning regulations applicable to their lands. The Golf Club requested a rezoning of about sixty acres of the tract to SM–Suburban Metropolitan zoning designation in order to permit construction of a clubhouse, hotel, accessory recreational facilities, and additional parking. R.R. 267a. The request was denied by unanimous decision of the governing body made on October 9, 1967. R.R. 268a.

Subsequent requests for legislative zoning relief fared no better. The governing body denied the petitions of a prospective purchaser of the Golf Club: (a) dated November 16, 1981 seeking a rezoning of 68 acres of the tract for the purpose of constructing office buildings while committing to maintain the remainder of the tract as a golf course, R.R. 285a–289a; (b) dated March 16, 1982 seeking a rezoning of a portion of the tract to SM–Suburban Metropolitan designation to permit development for office purposes while committing to maintain the balance of the tract (40 acres) as open space; and (c) dated December 9, 1982 seeking a rezoning of the tract to Administrative research designation for the purpose of constructing offices and a hotel. R.R. 291a–293a, 347a.

Following the final denial described above, the disappointed purchaser, with the Golf Club's consent and joinder, presented to the Township zoning hearing board a challenge to the substantive validity of the AG District designation of the tract. Twenty-three sessions of a public hearing were conducted by the board from January 1984 through July 1985 in which the Township and a citizens group opposed the challenge.

During the course of these proceedings before the board and in response to the citizens group's letter of inquiry, the supervisors' chairman prepared a memorandum to the governing body dated May 30, 1984, in which he first describes "the Board's goal of retaining the Golf Course as a Golf Course", and then discusses the Township's position with respect to the zoning ordinance validity challenge. After agreeing with the citizens group that "[t]he Golf Course issue is the single most important issue to confront the Board during 1984," the chairman represents: "[f]or myself, my goals are simple: (1) I would like to maintain the Golf Course as it is. I want to do this not only at this time but also in the future." R.R. 510a–511a.

In a report prepared during this initial validity challenge by the Township's land planner, John Rahenkamp & Associates, in June 1984, entitled "Evaluation Of Existing Agricultural Zoning District", the authors concluded that the only negative effect of the then proposed office/hotel development proposals on neighboring properties "would be the loss of the Golf Course." The planners continued:

The impact of the present … proposal is obvious in terms of the elimination of the open space, but not as obvious regarding infrastructure impacts. Given sufficient developer contributions and wide reaching traffic studies and plans … the road improvements contemplated might more than outweigh the impact of increased cars…. Both the storm water and sewage impacts can be handled. The tax ratables will have a positive fiscal impact on the township. On balance the issue clearly becomes loss of the open space which is an issue of significant public impact or visual loss because so few of the area residents use the Golf Course.

The bottom line is that this critical piece of remaining open space is in a concentrated area nearing if not surpassing urban intensities. The site may well be the link-pin [sic linchpin?] in a series of public decisions which must be made. The reality of the evolving urban character of the area must be dealt with thru [sic] a rational planning process. For instance a much higher level of transportation may be justified and this site may be critical to its success. Indeed, we feel that suburban-office may be underutilizing the site.... It is in the public interest to optimize the intensity of the site, in principle trading quantity for quality....

John Rahenkamp and Associates cannot excuse the township from responsibility for not moving forward on the critical planning to begin dealing with the realities of this intense core area. There are clearly no easy decisions....However, delays in effective public action can no longer be considered prudent nor in the public interest. R.R. 347a.

By decision and order dated September 5, 1985, the board denied the challenge. The purchaser then sought review of the zoning board's decision before the trial court, but the expiration of the purchaser's contractual rights required dismissal of the appeal. Despite the inability of the Township's planners in 1984 to justify municipal inaction to that point, no public action was taken with respect to the Golf Club for more than a dozen additional years until, by letter dated October 29, 1997, less than two weeks prior to the filing of the instant validity challenge, and presumably in anticipation thereof, the Township tendered a formal purchase offer.

On November 13, 1997, Realen, under contract to purchase the property, presented its zoning ordinance validity challenge to the Township zoning board. Realen's challenge included claims that the Golf Club's AG District zoning constitutes spot zoning, special legislation, and is both arbitrary and irrational. Two conceptual site plans were presented with the challenge to illustrate the desired definitive relief. Plan A depicted development of the property for multi-family residential use

including both apartments and townhouses (designed to comply with the area and bulk regulations applicable to the adjoining OA–Office Apartment zoning district in adjoining Tredyffrin Township, Chester County), a hotel, and retail and other commercial uses (designed to comply with the regulations applicable in the Township's C–2 Commercial zoning district). R.R. 12a. Plan B, designed to comply in all respects with the regulations applicable in the Township's C–2 Commercial zoning district, depicts development of the property for office, hotel, retail and other commercial uses. R.R. 13a.

Fourteen sessions of a public hearing were conducted by the zoning board between February 1998 and June 1999 in the matter of Realen's challenge. By decision dated August 13, 1999, the zoning board denied the challenge in every respect. In rejecting Realen's spot zoning challenge, the zoning board concluded

> The subject property is unique. The subject property has many distinguishing features that make it different from other surrounding properties. Such characteristics include its shape, road frontage, adjoining and existing uses as well as natural features, not to mention the shear large size of the property.

Zoning board decision at 24. Of these factors, the major arterial highways serving as the tract's perimeter were, in the board's view, the strongest zoning justification.

On further appeal, the trial court, by decision dated December 1, 2000, affirmed the zoning board's rejection of Realen's challenge as did a panel of the Commonwealth Court by decision dated June 4, 2002. We granted Realen's petition for allowance of appeal by order dated December 18, 2002. *In re Appeal of Realen Valley Forge Green Associates,* 572 Pa. 716, 813 A.2d 847 (2002). In reviewing the decision of a zoning hearing board where the trial court has not taken any additional evidence, as in the instant case, appellate review is limited to determining whether the board abused its discretion or committed a legal error. *Crown Communications v. Zoning Hearing Board of Glenfield,* 550 Pa. 266, 705 A.2d 427, 430

(1997). As this Court wrote in *Cranberry Park Associates ex rel. Viola v. Cranberry Township Zoning Hearing Board,* 561 Pa. 456, 751 A.2d 165, 166 (2000):

> In reviewing the Board's decision, we note that our analysis is limited to "determining whether the Board abused its discretion, committed an error of law, or made findings of fact not supported by substantial evidence." *Upper Salford Township v. Collins,* 542 Pa. 608, 669 A.2d 335, 337 (1995). Furthermore, when an appeal presents a question of law, such as the present case, our scope of review is plenary. *Kmart Corp. v. Workers' Compensation Appeal Board (Fitzsimmons),* 561 Pa.111, 748 A.2d 660, 662 (2000).

Realen here renews the contentions rejected by the zoning board and the courts below [6]: that the AG District zoning designation of the Golf Club property constitutes unlawful spot zoning and special legislation and was motivated at its inception and at all times thereafter by a governmental purpose and intent not to control, restrict, or coordinate development; but to prevent development altogether so that the property could be maintained as open, green space to the considerable benefit of the public generally.

These challenges, although presented as independent grounds for relief, are closely related by their principal premises and the methods of their analysis. Indeed, each of Realen's challenges has at its conceptual core the following well-established legal precepts.

The right of landowners in this Commonwealth to use their property as they wish, unfettered by governmental interference except as necessary to protect the interests of the public and of neighboring property owners, is of ancient origin, recognized in the Magna Carta, and now memorialized in Article I, Section 1 of the Pennsylvania Constitution (protecting as an "inherent right of mankind ... acquiring, possessing and protecting property").

---

**6.** Realen here raises an additional issue in the nature of a challenge to the traditional formulation of the scope of judicial review of a zoning hearing board's factual determinations.

Property owners have a constitutionally protected right to enjoy their property. . . . That right, however, may be reasonably limited by zoning ordinances that are enacted by municipalities pursuant to their police power, *i.e.,* governmental action taken to protect or preserve the public health, safety, morality, and welfare. *Cleaver [v. Board of Adjustment],* 414 Pa. 367, 200 A.2d [408] at 411–12 [ (Pa.1964) ] ("it is well settled that [the] Constitutionally ordained right of property is and must be subject and subordinated to the Supreme Power of Government—generally known as the Police Power—to regulate or prohibit an owner's use of his property"). Where there is a particular public health, safety, morality, or welfare interest in a community, the municipality may utilize zoning measures that are substantially related to the protection and preservation of such an interest. *National Land and Investment Co. v. Easttown Township Board of Adjustment,* 419 Pa. 504, 215 A.2d 597, 607 (1966); *see also* 53 P.S. § 10603(a) (zoning ordinance should reflect the needs of the citizens and the suitability and specific nature of particular parts of the municipality).

*C & M Developers, Inc. v. Bedminster Township Zoning Hearing Board,* 573 Pa. 2, 820 A.2d 143, 150 (2002). The limit beyond which the power to zone in the public interest may not transcend is the protected property rights of individual landowners. Our cautionary words in *Cleaver,* 200 A.2d at 413 n. 4, are no less appropriate today:

The natural or zealous desire of many zoning boards to protect, improve and develop their community, to plan a city or a township or a community that is both practical and beautiful, and to conserve the property values as well as the 'tone' of that community is commendable. But they must remember that property owners have certain rights which are ordained, protected and preserved in our Constitution and which neither zeal nor worthwhile objectives can impinge upon or abolish.

Recognizing that "[u]nder the traditional standard applied when determining the validity of zoning ordinances, a zoning ordinance must be presumed constitutionally valid un-

less a challenging party shows that it is unreasonable, arbitrary, or not substantially related to the police power interest that the ordinance purports to serve", *C & M Developers*, 820 A.2d at 150–51, nevertheless,

> [a]mong other reasons, an ordinance will be found to be unreasonable and not substantially related to a police power purpose if it is shown to be unduly restrictive or exclusionary.... Similarly, an ordinance will be deemed to be arbitrary where it is shown that it results in disparate treatment of similar landowners without a reasonable basis for such disparate treatment.... Moreover, in reviewing an ordinance to determine its validity, courts must generally employ a substantive due process inquiry, involving a balancing of landowners' rights against the public interest sought to be protected by an exercise of the police power.

*Id.* Moreover,

> The substantive due process inquiry, involving a balancing of landowners' rights against the public interest sought to be protected by an exercise of the police power, must accord substantial deference to the preservation of rights of property owners, within constraints of the ancient maxim of our common law, *sic utere tuo ut alienum non laedas.* 9 Coke 59—So use your own property as not to injure your neighbors. A property owner is obliged to utilize his property in a manner that will not harm others in the use of their property, and zoning ordinances may validly protect the interests of neighboring property owners from harm.

*Hopewell Township Board of Supervisors v. Golla*, 499 Pa. 246, 452 A.2d 1337, 1341–42 (1982).

> Hence, the function of judicial review, when the validity of a zoning ordinance is challenged, is to engage in a meaningful inquiry into the reasonableness of the restriction on land use in light of the deprivation of landowner's freedom thereby incurred.

*Id.,* 452 A.2d at 1342.

 The Township, as a municipal entity possessing only those powers expressly delegated by the Commonwealth,

derives its zoning power from the Pennsylvania Municipalities Planning Code, the Act of July 31, 1968, P.L. 805, No. 247, *as amended* ("MPC"), 53 P.S. § 10101 *et seq.* As is there mandated, the Township's zoning regulations must be designed "[t]o accommodate reasonable overall community growth, including population and employment growth and opportunities for development of a variety of residential dwelling types and nonresidential uses." MPC § 604(5), 53 P.S. § 10604(5). As regulations grounded in the delegated police power, zoning must accomplish "an average reciprocity of advantage" so-termed by Mr. Justice Holmes in *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922), by which "[a]ll property owners in a designated area are placed under the same restrictions, not only for the benefit of the municipality as a whole but also for the common benefit of one another." *United Artists Theater Circuit, Inc. v. City of Philadelphia, Philadelphia Historical Commission,* 528 Pa. 12, 595 A.2d 6, 13 (1991).

Spot zoning challenges have at their conceptual core the principle that lawful zoning must be directed toward the community as a whole, concerned with the public interest generally, and justified by a balancing of community costs and benefits. These considerations have been summarized as requiring that zoning be in conformance with a comprehensive plan for the growth and development of the community. Spot zoning is the antithesis of lawful zoning in this sense. In spot zoning, the legislative focus narrows to a single property and the costs and benefits to be balanced are those of particular property owners.

In *Appeal of Mulac,* 418 Pa. 207, 210 A.2d 275, 277 (1965), we confirmed the definition of "spot zoning" described in such authorities as *Cleaver v. Board of Adjustment, Upper Darby Township Appeal,* 413 Pa. 583, 198 A.2d 538 (1964); *Glorioso Appeal,* 413 Pa. 194, 196 A.2d 668 (1964); and *Putney v. Abington Township,* 176 Pa.Super. 463, 108 A.2d 134 (1954), "as a singling out of one lot or a small area for different treatment from that accorded to similar surrounding land

indistinguishable from it in character, for the economic benefit of the owner of that lot or to his economic detriment is invalid 'spot' zoning." Viewed more generally, "spot zoning ... is an arbitrary exercise of police powers that is prohibited by our Constitution." *United Artists' Theater Circuit, Inc. v. City of Philadelphia,* 535 Pa. 370, 635 A.2d 612, 620 (1993). While the size of the zoned tract is a relevant factor in a spot zoning challenge, "the most important factor in an analysis of a spot zoning question is whether the rezoned land is being treated unjustifiably different from similar surrounding land." *Schubach v. Silver,* 461 Pa. 366, 336 A.2d 328, 336 (1975).

The zoning board rejected Realen's spot zoning challenge on the ground that the difference in zoning treatment between the agriculturally designated Golf Club property and the adjoining properties, all of which are designated for intense, commercial development, is justified by the "shape, road frontage, adjoining and existing uses as well as natural features, not to mention the shear large size of the property." Zoning board decision at 24.

The trial court agreed with the zoning board's analysis and the Commonwealth Court affirmed, writing:

the Board found that the Property is unique and distinguishable in several respects from the surrounding properties. (Board's Op., Findings of Fact Nos. 40–42, at 7, 8). Two notable differences found by the Board were that the Property is considerably larger than the surrounding properties and the Property is completely surrounded by roadways. (Findings of Fact Nos. 61–62).

*In re Realen Valley Forge Greenes Associates* 799 A.2d 938, 944–45 (Pa.Cmwlth.2002) (footnote omitted).

The analysis of the tribunals below on this issue is seriously flawed. First, the large size of the tract is not determinative. Zoning unjustifiably discriminatory is beyond the municipality's police power and "[i]t makes no difference whether it is a 1/4 acre lot or a 50 acre industrial complex area...." *Commercial Properties, Inc. v. Peternel,* 418 Pa. 304, 211 A.2d 514, 519 (1965) (invalidating as "spot zoning" the

rezoning of a tract from commercial to residential designation for the purpose of preventing a shopping center development for which the landowner had conditionally agreed to sell the property), or, we might add, a 135 acre golf course. The question is whether the lands at issue are a single, integrated unit and whether any difference in their zoning from that of adjoining properties can be justified with reference to the characteristics of the tract and its environs.

Of the land characteristics offered by the zoning board in support of its rejection of the spot zoning challenge, only the size of the tract and its location entirely bounded by arterial highways, are the subject of any discussion. There can be no question, as the zoning board found, that arterial roadways are, in many instances, an appropriate feature to be designated as the boundary between incompatible zoning districts. But the issue here is not whether *any* zoning district designation could be appropriately applied to the Golf Club's lands but whether the AG District designation can be so justified. It turns reason and land planning precepts on their head to assert, as the zoning board's decision implies, that this tract's *restricted, agricultural zoning* is justified by its ready access to the region's primary arterial roads on every hand. Apart from a bare assertion that it is so, neither the zoning board nor the courts below have offered either reason or authority to support the proposition, essential to the propriety of the decision here reviewed, that the location of these highways makes agricultural zoning appropriate for this tract while the properties on the opposite side of the same roadways are appropriately zoned and developed for intense, commercial use. Any relationship between agricultural zoning and the other tract characteristics identified in the decisions below, including the property's topography and shape, is similarly unexplored in the evidence of record, the findings of the Board, or the arguments of appellees.

On this record, no characteristic of the Golf Club's property justifies the degree of its developmental restriction by zoning as compared to the district designation and use of all of the

surrounding lands both within the Township and in the adjoining municipality. This is spot zoning.

We recognize that the circumstances here presented differ factually from the spot zoning cases we have previously decided in the chronology of the municipal action creating the unjustified "island" of disparate zoning. In previous cases, the island was created by a single municipal act directed toward the property which became the disputed island; either to that property owner's benefit or detriment. Here, in contrast, the Golf Club's status as an island of agricultural zoning was the product of a series of rezonings of surrounding properties beginning in the 1950's and ending in about 1985.

Realen contends that the origin of a tract's unjustified zoning treatment as compared to adjoining properties is not decisive and we agree. It is the difference in treatment that must be justified, not its origin or chronology. Some courts have used the term "reverse spot zoning" to describe the circumstances where the unjustified difference in treatment arises from the rezoning of lands surrounding the tract at issue and this term appropriately underscores the distinction between cases like that here presented where an island is created by the rezoning of other land from the more common situation where the challenged legislation is that creating the island tract.[7]

7. Appellant relies primarily on authorities of the appellate courts of Florida which have applied the term "reverse spot zoning" in invalidating refusals to rezone under circumstances having striking similarities to those here presented. *See,* for example, *Tollius v. City of Miami,* 96 So.2d 122 (Fla.1957), and *City of Miami Commissioners v. Woodlawn Park Cemetery Co.,* 553 So.2d 1227 (Fla.App.1989). While not controlling here, these decisions present the persuasive view that reverse spot zoning is invalid in precisely the same sense and on the same grounds as spot zoning has been traditionally condemned; namely, that the rezoning and development of surrounding lands narrows the legislative focus to a single property or small area the differing zoning treatment of which can not be justified with reference to any of the community-wide concerns that serve as the legitimate basis for zoning in conformance with a comprehensive plan.

In this Commonwealth, the decisions reported as *LHT Associates, LLC v. Township of Hampton,* 809 A.2d 1072 (Pa.Cmwlth.2002), and *Guentter v. Borough of Lansdale, Montgomery County,* 21 Pa.Cmwlth. 287, 345 A.2d 306, 309 (1975), have defined the term as follows:

As we indicated at the outset, Realen finally asks this Court (as it unsuccessfully petitioned the courts below) to reexamine an unbroken line of authorities which have limited the scope of judicial review of the findings of zoning hearing boards to a determination of whether those findings are supported by substantial record evidence. *See, for example, Nettleton v. Zoning Board of Adjustment of City of Pittsburgh*, 828 A.2d 1033, 1041 (Pa.2003) ("[t]he Zoning Board as factfinder is the sole judge of credibility and conflict in the testimony and has the power to reject even uncontradicted testimony that the Board finds to be lacking in credibility"); *Valley View Civic Association v. Zoning Board of Adjustment*, 501 Pa. 550, 462 A.2d 637, 642 (1983) (same).

Realen contends that it is not possible for a challenger to meet its evidentiary burden where the factfinder possesses such unbridled discretion in its credibility determinations and the body with the statutory power to appoint members of the fact-finding tribunal—the municipal governing body—actively participates in opposition to the challenge. Our decision with respect to Realen's reverse spot zoning challenge makes it unnecessary to decide this novel issue. We will note, however, that the zoning board's fact finding in this case includes particularly troubling examples of the difficulty Realen describes. For example, the zoning board here found as a pivotal fact that "[t]he subject property can be used and developed with single family detached dwellings, which are permitted by right on the subject property." Factual Finding No. 68, zoning board's decision at 10. The Township's expert land planner testified during the course of the board's hearing just to the contrary including the direct conclusion that none of the uses permitted by right on the tract are "practical." R.R. 460a. Realen's expert witnesses testified unambiguously that single-family detached homes are not a feasible use for this intensely developed, commercial area of the Township.

"[r]everse spot zoning occurs where an "island" develops as a result of a municipality's failure to rezone a portion of land to bring it into conformance with similar surrounding parcels that are indistinguishable." *LHT Associates*, 809 A.2d at 1075. We here use the term in this sense.

*See* R.R. 391a–393a. Therefore, the zoning board's conclusion must be predicated on disbelief not only of the testimony of the challenger's experts but of the Township's experts offered in support of the ordinance as well.

We may be presented at some point in the future with an appeal that requires us to decide whether a zoning hearing board's performance of its fact-finding function deprived the applicant of a fundamentally fair proceeding and whether particular necessary findings of the board, although minimally supported by record evidence, capriciously and without reasonable explanation disregard overwhelming evidence having a contrary import. We are not required to resolve these issues in the present context and we decline to do so.

For these reasons, the order of the Commonwealth Court is hereby reversed and the record is remanded to the Court of Common Pleas of Montgomery County for further proceedings consistent with this opinion, our decision reported as *Casey v. Zoning Hearing Board of Warwick Township*, 459 Pa. 219, 328 A.2d 464, 469 (1974), and MPC § 1006–A (c) through (e), 53 P.S. §§ 11006–A(c) through (e), which require that Realen be afforded "definitive relief" as the successful challenger of the Township's zoning ordinance.

Justice NIGRO and Justice NEWMAN did not participate in the consideration or decision of this case.

Justice SAYLOR files a dissenting opinion.

### DISSENTING OPINION

Justice SAYLOR.

I am in accord with the Commonwealth Court's application of the legal principles governing constitutional validity challenges in the zoning arena, which are to be implemented with essential deference to legislative policy judgments arising out of the political process. *See In re Appeal of Realen Valley Forge Greenes Assoc.*, 799 A.2d 938, 942 (Pa.Cmwlth.2002). Additionally, I agree with that court's application of the relevant standard of appellate review, which is also deferential in

terms of the judgment of the fact-finding tribunal. *See id.* Thus, I would affirm the Commonwealth Court's order based on the analysis that it has supplied, with the following supplementation, in light of the majority's contrary approach in the present appeal.

As a threshold matter, although the majority characterizes its analysis as substantial evidence review, I disagree that this is, in fact, the manner of review that it applies. Indeed, to assess whether or not the Zoning Hearing Board's factual findings (which are favorable to the Township) are grounded in substantial evidence, it is, by the nature of the exercise, essential for the Township's evidence be considered. It is telling, in this regard, that each and every citation offered by the majority is to that portion of the record comprising Appellant's, and not the Township's, presentation.

The majority's approach to the Zoning Hearing Board's findings and the Township's evidence is apparent from the outset of its opinion, where it announces its holding that the zoning ordinance at issue was "designed to prevent development of the subject property and to 'freeze' its substantially undeveloped state for over four decades in order to serve the public interest as 'green space[.]'" Majority Opinion, 576 Pa. at 119, 838 A.2d at 721. This directly contravenes the Zoning Hearing Board's finding, supported by a multitude of factual findings closely grounded by way of citations to the hearing record, that through implementation of its governing zoning ordinance, the Township designed to allow, and has allowed, for multiple, economically viable, lower-density uses, as of right, as conditional uses, and by special exception. *See Application of Realen Valley Forge Greene Assoc.,* Nos. 58–00–04312–00–4, 58–00–17494–007, *slip op.,* at 9, FOF ¶ 59 (ZHB Upper Merion Aug. 13, 1999) (citing N.T., at 1141–1144); *see also id.* at 34 ("the intent of the AG zoning classification of the subject property is to encourage uses of lower density and intensity, particularly with regard to traffic, than would be permitted in less restrictive zoning classifications"). Such uses include development of single family detached dwellings, FOF ¶ 69–72 (citing N.T., at 682, Ex. T–

12);[1] utilization as a hospital, convalescent home or personal care facility, *id.* at 11, FOF ¶ 73–75 (citing N.T., at 783, 785–86, 1098–1109), educational, religious, and/or philanthropic use, *id.*, FOF ¶ 76 (citing N.T., at 782), laboratory and research use, *id.*, FOF ¶ 78–79 (citing N.T., at 789); single family cluster development and personal care facilities, *id.*, FOF ¶ 80 (citing N.T., at 685, 801); an assisted living facility, *id.*, FOF ¶ 81–82 (citing N.T., at 783, 1111), and combination uses, *id.* at 11–12, FOF ¶¶ 83–84, in addition to the present, economically viable use as a golf course. *id.* at 10 ¶¶ 64–67.[2]

Indeed, the majority's portrayal of a "holding zone," drawn from Appellant's evidence, was also squarely refuted by one of the Township's land planning experts, John E. Rahenkamp, who testified:

I don't believe that the fact that it hasn't been developed can be characterized as a holding zone. There were uses possible. There are many applications that came forward. The fact that they weren't successful, unfortunately, I don't know which side bears the obligation or the responsibility, but the transactions failed to go forward. That's not to say

1. In indicating (again, contrary to the findings of the Board) that single family residential development is not a feasible use for the property, the majority again relies on the evidence most favorable to Appellant, *see* Majority Opinion, 576 Pa. at 136-37, 838 A.2d at 731–32 (citing testimony from Appellant's expert witness), and omits the evidence favorable to the Township. *See, e.g.,* N.T., at 682 (testimony of John E. Rahenkamp) ("It's obviously not an ideal site for large lot single-family homes. *Could it be used for that, yes.* But its not an ideal use." (emphasis added)). The Commonwealth Court's approach, on the other hand, took into account both lines of evidence and properly determined that their reconciliation rested squarely within the ambit of the fact-finder. *See Realen,* 799 A.2d at 942–43.

2. Again citing only Appellant's evidence, the majority also goes to some lengths to demonstrate that Township officials had and/or have a strong preference that the Property remain in its present, largely open state, including by way of reference to the comprehensive plan and various efforts undertaken, over the years, in furtherance of the open-space objective. However, the substantial evidence discussed above, accepted by the Zoning Hearing Board, also supports its inference that, regardless of the personal preferences of Township officials, there was an appreciation among the members of the governing body who enacted the controlling zoning ordinance that it would be unduly restrictive to limit the Property to its existing, albeit desirable, use.

the application, the developer or landowner didn't have opportunities to bring forward a case to the boards. So I don't see that as characterizing a holding zone at all, but in fact a place in which a great deal of activity has happened and there is yet to be a match between the landowner's needs and desires and the ability of the town to accommodate it in some fair and reasonable way.

N.T. at 871.

Similarly, in reaching its critical conclusion that the zoning ordinance represents an impermissible instance of spot zoning, the majority both overlooks substantial evidence offered by the Township and, for reasons that it does not reveal, affords little or no weight to the circumstances that it acknowledges do militate in the Township's favor. Principally, while correctly recognizing that the most important factor in the analysis is whether the governing body has treated the property differentially for reasons that are not justifiable, *see* Majority Opinion, 576 Pa. at 133-34, 838 A.2d at 729 (citing *Schubach v. Silver*, 461 Pa. 366, 382, 336 A.2d 328, 336 (1975)), the majority nevertheless fails to confront the Zoning Hearing Board's explicit factual findings related to uniqueness, *see Realen, slip op.*, at 6 FOF ¶ 35, 7–8 FOF ¶ 40–46, 9 FOF ¶ 54–61,[3] and the associated substantial, supporting evidence.

In this regard, first off, the majority apparently attaches no import to the fact that the property was developed in the 1920s, and presently is maintained, as a golf course. Such factor, however, was explicitly relied upon by the Zoning Hearing Board as a distinguishing feature, *see Realen, slip op.* at 24, which reliance was supported by the testimony of two expert land planners. *See, e.g.*, N.T., at 762 (testimony of John E. Rahenkamp) ("The surrounding sites are relatively smaller, are differently configured, don't have a golf course

---

3. It has also been said that, for a validity challenge based on spot zoning to have merit, the inconsistencies between zoning classifications must be so great as to indicate on its face an absence of planning, or the presence of special treatment. *See Cleaver v. Board of Adjustment of Tredyffrin Twp.*, 414 Pa. 367, 200 A.2d 408 (1964). Notably, here, however, Appellant concedes the facial validity of the AG zoning. *See* Brief for Appellant, at 23.

sitting in the middle of them. They are obviously zoned differently and should be."); N.T., at 1141 (testimony of E. Van Reiker) (emphasizing the uniqueness of the Property in terms of its existing development and use). Indeed, the conversion of the Property into a golf course entailed extensive regrading and landscaping, see, e.g., N.T., at 295–96, 694–95, 802, which, because of the use to which the landowner of his own accord put it, the Township out of necessity was required to plan around.[4]

The majority also discounts the Property's 135–acre size as a substantial factor in the equation, despite the clear indication in the cases that size should be considered a factor, albeit not necessarily a controlling one, see generally ROBERT S. RYAN, PENNSYLVANIA ZONING LAW AND PRACTICE § 3.4.9 (2003) ("Generally speaking, the zoning of larger tracts of land is not subject to a charge of discrimination[;] ... [w]here a large area is devoted to a given zoning classification, the risks of special treatment, or an absence of planning, are greatly reduced, or eliminated."), as well as clear record evidence. See, e.g., N.T., at 763 (testimony of John E. Rahencamp) (observing that the size of the tract "certainly makes it unique in the context of Upper Merion Township"); N.T., at 1141 (testimony of E. Van Reiker) ("Size of site is very critical in my view relative to looking at the side in a discrete or separate purpose. The larger the property becomes, the more, in my view, in my opinion, it stands alone in terms of critical analysis for land use.").

The majority also affords little weight to the circumstances that the Property is surrounded by roadways, which are commonly used as boundary designations for zoning districts, as a reasonable justification for the zoning classification, in contravention of the testimony of Appellant's own expert land planner:

4. While the majority makes much of the fact that some rezoning of small tracts of AG lands occurred after the landowner requested rezoning for the golf course, it is significant, in my view, that the great majority of the rezoning occurred during the 1955 to 1960 time period, see N.T., at 382, 458, at least seven years prior to the landowner's first such request.

Q. Would you agree with me that in creating zoning districts, it is frequently common to use roads that separate one property from another as differences in zoning districts?

A. Roads are often used to separate different districts, yes.

N.T., at 243; *accord* N.T., at 1142 (testimony of E. Van Reiker) (explaining that roads are principal tool used by land planners).[5]

Further findings and evidence concerning uniqueness touch on the unusual terrain, *see, e.g.,* N.T., at 694–95, 802 (testimony of John E. Rahenkamp) ("Internal to the site as well, there is almost sixty foot of grade across the site. It is a fairly significant roll. It is significant in terms of the visual quality around the whole area, not only internally but externally as well."); environmental considerations related to the Property, *see* N.T., at 726–33, 767, 832; the Property's ameliorative effect in terms of traffic and noise, *see* N.T. at 694–95; the visual significance of the property, particularly in light of its proximity to the Valley Forge National Park, *see id.;* N.T., at 721–22, 740, 749–50; and the consistent zoning of the property since 1953. Again, Mr. Rahenkamp's testimony perhaps most succinctly encapsulates the record evidence of uniqueness as it relates to the justification for the Property's differential classification:

A. This site is unique compared to the sites surrounding it.

**5.** Relatedly, the majority places undue emphasis, in contravention of the judgment of the fact-finder, on the proximity of commercial uses to the Property. In this regard, Appellant's land planning expert also testified:

Q. [I]n general, zoning is a concept that permits different types of uses on different parcels of ground within the municipality?
A. Yes.
Q. Some may be commercial, some may be industrial, some may be residential, some may be open space, but you get a whole variety of possible uses?
A. Yes.
Q. And obviously, some of these uses will be adjacent and right next to each other; correct?
A. Yes.
N.T., 452–53.

Q. In what way is it unique, Mr. Rahenkamp?

A. It has significant elevation changes. It has significant vegetation. It happens to have an existing golf course in place on it. At least the sites on North Gulph Road on the upper side staddling essentially between the turnpike on the one side and North Gulph are relatively small. This is a large site. It's on one hundred and thirty-five acres in a township that has been characterized as an edge city, almost an urban place. One hundred thirty-five acres of vacant land is significant. This is not a small, incidental piece of ground and it's certainly not comparable at least in the size of the context to anything surrounding it.

\* \* \*

Q. Is the AG zoning an appropriate zoning designation for this tract in your opinion?

A. It's obviously not the most refined zoning ordinance that ever was for this parcel of ground. On the other hand, because of its unique character, special exceptions, conditional uses are appropriate because you need to evaluate essentially how to place finesse on a piece of ground. It has a golf course on it. It has got some existing characteristics which are critical. And most particularly in terms of traffic, it has some very sensitive issues. It's very nearly to the point of overload.

\* \* \*

The existing AG zoning with the special exceptions and conditional uses is appropriate for this site. I have said several times it could be refined but it is certainly more appropriate than would be conventional office zone or a conventional residential zone or any of the conventional by-right zones which wouldn't reckon with the uniqueness of this site.

N.T., at 761–62.[6]

This testimony segues into the Zoning Hearing Board's findings concerning the public interests supporting low-density

**6.** Particularly in view of the obvious sensitivity of this property, at least on the face of this record, Appellant's development plans in relation to

uses for such a property based on record evidence include prevention of overcrowding of land and congestion in travel and transportation, particularly given the location of the Property proximate to and abutting already overtaxed highways. *See id.* at 12, FOF ¶¶ 88, 90–91. In this regard, the Zoning Hearing Board found that conceptual plans for higher-density, commercial use such as those advanced by Appellant would have a severe, negative impact on the roadways surrounding the Property. *See id.* at 13, FOF ¶ 96 (citing N.T., at 1049–57, 1063). Notably, the prevailing traffic conditions on such roadways were described by transportation engineers as poor, *see* N.T., at 1223 (analogizing the conditions of various roadways surrounding the property to an overflowing bathtub), 1239, and by residents as far worse. *See, e.g.,* N.T., at 60–61 (reflecting a resident's perception that traffic and noise in the area is "horrendous"). Additionally, as the Zoning Hearing Board noted, there was no direct evidence that the various permutations of land development authorized by the applicable zoning ordinance had been or would be disapproved by the municipality—neither Appellant nor the legal owner had submitted conceptual plan layouts for permitted uses, considered design layouts under the applicable criteria, or presented evidence that development of the Property within the constraints of the AG zoning district was economically impossible or unfeasible. *See id.* at 14, FOF ¶¶ 105–06 (citing N.T., at 313, 322).[7] The evidence that was credited by the Zoning Hearing Board as fact-finder merely demonstrates that the

the Property were not only inappropriate, but were inflammatory. In this regard, there was unrebutted evidence to the effect that such plans reflected no correlation to any kind of an analysis of the site in terms of building placement and preservation of natural features, *see* N.T., at 706, 722, 726, 728; no evaluation of reasonable density, *see* N.T., at 322, 324; and no concern for environmental factors. *See* N.T., at 733. Indeed, Appellant presented no rebuttal of the assertion by the Township's expert that the plans effectively represented an evisceration of the site. *See* N.T., at 733; *accord id.* at 876 ("if the developer is willing and able to abuse the land that extraordinarily, I would certainly question whether or not that application ought to go forward.").

7. While the majority references the inability on the part of the landowner to gain developmental approval, each of the proposals made to the Township entailed efforts to obtain rezoning, not plans for lower-density development consistent with the existing zoning.

non-conforming commercial uses proposed by Appellant would be more lucrative, which, although certainly relevant, is an insufficient basis in and of itself to support invalidation of a legislative policy decision. *See Kimberton Green, Inc. v. Borough of Phoenixville*, 43 Pa.Cmwlth. 244, 247, 402 A.2d 284, 286 (1979); *accord National Land and Investment Co. v. Easttown Twp.*, 419 Pa. 504, 524–25, 215 A.2d 597, 608 (1965); *Montgomery Crossing Assoc. v. Township of Lower Gwynedd*, 758 A.2d 285, 290–91 (Pa.Cmwlth.2000). *See generally* 101A C.J.S. ZONING & LAND PLANNING § 47 (2003) ("A zoning ordinance is not invalid because it does not permit, or prevents, the highest or best use of the property, or a use which is the most profitable for the owner, since a property owner is not entitled to have his property zoned for its most profitable use.").

The majority's analysis, entailing the substitution of its findings for those of the fact-finder, has the effect of displacing the difficult, but I believe necessary, task of weighing public and private interests necessary under the Due Process Clause, which, despite the United States Supreme Court's approach,[8] remains this Court's preferred method of assessing

**8.** The United States Supreme Court generally considers validity challenges under the Fifth Amendment's Takings Clause. Notably, it has rarely deemed general low-density-use zoning restrictions, and even open-lands designations, to be takings. *See, e.g. Agins v. City of Tiburon*, 447 U.S. 255, 261–62, 100 S.Ct. 2138, 2142, 65 L.Ed.2d 106 (1980) (rejecting a facial Takings Clause challenge to a zoning ordinance establishing, *inter alia*, an "open space zone," concluding that controlling urbanization and preserving open space advance legitimate state goals), *overruled on other grounds First English Evangelical Lutheran Church of Glendale v. Los Angeles County*, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987). Indeed, it is also noteworthy that the takings test applied by the United States Supreme Court, in material respects, resembles this Court's substantive due process inquiry applicable here. *Compare Agins*, 447 U.S. at 260, 100 S.Ct. at 2141 (requiring, *inter alia*, an assessment of the weight of public interests in takings jurisprudence), *with C & M Developers, Inc. v. Bedminster Twp. Zoning Hearing Bd.*, 573 Pa. 2, 14, 820 A.2d 143, 151 (2002) (describing the balancing of public and private interests under the doctrine of substantive due process). *See generally* Kenneth Salzberg, *"Takings" as Due Process, or Due Process as "Takings"?*, 36 VAL. U.L.REV. 413, 429–33 (2002) (commenting on the present overlap between federal takings and substantive due process jurisprudence).

validity challenges in the land use arena. *See C & M Develop-ers*, 573 Pa. at 14, 820 A.2d at 151. In performing the necessary judicial balancing, it is important to maintain the perspective that land use regulation is a traditional, legislative tool implemented in furtherance of broader public concerns—compliance with non-arbitrary regulation is generally an accepted incident to land ownership and investment. *See Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1027, 112 S.Ct. 2886, 2899, 120 L.Ed.2d 798 (1992) ("It seems to us that the property owner necessarily expects the uses of his proper-ty to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police powers."); Mark W. Cordes, *Property Rights and Land Use Controls: Balancing Private and Public Interest*, 19 N. ILL. U.L.REV. 629, 652 (1999) (noting that "any reasonable expecta-tions in the land must take into account the possibility of regulation"). *See generally* Frank I. Michelman, *A Skeptical View of "Property Rights" Legislation*, 6 FORDHAM ENVTL. L.J. 409, 415 (1995) ("The American way, as the Court describes it, is to treat the bulk of events as belonging to the normal give-and-take of a progressive and democratic society; it is to treat regulation as an ordinary part of background risk and oppor-tunity, against which we all take our chances in our roles as investors in property.").[9]

It is also worth reflecting on the character of judicial review on consideration of a challenge to the validity of a legislative enactment pursuant to substantive due process precepts—notably, the application of the doctrine has been extensively and critically examined, particularly in the arena of economic regulation, over the years that have passed since *Lochner v. New York*, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905). *See,*

9. *But cf. Lucas*, 505 U.S. at 1034, 112 S.Ct. at 2903 (Kennedy, J., concurring) (conceding that an inherent circularity results where a property "owner's reasonable expectations are shaped by what courts allow as a proper exercise of governmental authority" because then "property tends to become what courts say it is"); Richard A. Epstein, *Lucas v. South Carolina Coastal Council: A Tangled Web of Expecta-tions*, 45 STAN. L.REV. 1369, 1385–86 (1993) (criticizing the use of existing regulations as a basis for discounting property rights based upon a theory of landowners' reasonable expectations of future regula-tions).

*e.g.,* David A. Strauss, *Why Was Lochner Wrong?,* 70 U. CHS. L.REV. 373, (2003) (discussing *Lochner*-era substantive due process and its aftermath and concluding that "judicial review requires courts to recognize the complexity of the issues they confront and to develop doctrines that, while vindicating constitutional rights, also accommodate values that are in tension with those rights").[10] Presently, the opinions of judges and commentators are many and varied concerning the appropriate role of substantive due process in economic (including land use) regulation, ranging from its discrediting as a legitimate constitutional doctrine, *see, e.g.,* Robert Ashbrook, Comment, *Land Development, The Graham Doctrine, and the Extinction of Economic Substantive Due Process,* 150 U. PA. L.REV. 1255, 1285–1295 (2002), to its full restoration in repair of other constitutional doctrines that are argued to be stretched to their limits on account of a void opened by the presently disfavored status of substantive due process. *See, e.g.,* Salzberg, *"Takings" as Due Process,* 36 VAL. U.L. REV. at 429–34, 442. A common thread throughout the cases and the literature, nevertheless, seems to be that if courts are to maintain legitimacy in the application of substantive due process in considering government regulation, they must begin with a healthy respect for legislative, social policy judgments. *See generally* Peter J. Rubin, *Square Pegs and Round Holes: Substantive Due Process, Procedural Due Process, and the Bill of Rights,* 103 COLUM. L.REV. 833, 839 (2003) ("[T]he risks inherent in the use of any open-ended constitutional provision to invalidate the actions of the political branches, certainly counsel caution in employing substantive due process.").

Here, there should be no question that strong public interests are involved, in light of the governing body's concern with

10. While the majority does not expressly ground its analysis specifically in substantive due process, it acknowledges the interrelationship between the various theories for attacking the validity of an ordinance, *see* Majority Opinion, 576 Pa. at129-131, 838 A.2d at 727, and does cross-reference substantive due process principles, *see id.* 576 Pa. at 131-34, 838 A.2d at 728–29. *See generally* EDWARD H. ZIEGLER, JR., ARDEN H. RATHKOPF, AND DAREN A RATHKOPF, 3 RATHKOPF's THE LAW OF ZONING AND PLANNING § 41.3 (4th ed.2003) (recognizing the grounding of claims of spot zoning, *inter alia,* in substantive due process principles).

overcrowding of land and congestion of transportation arteries, credited by the fact-finder. *See generally C & M*, 573 Pa. at 21, 820 A.2d at 155 (explaining that municipalities may utilize zoning ordinances to regulate, *inter alia*, density of population and intensity of use and to protect and preserve resources (citing 53 P.S. § 10603(b))). *See generally* 101A C.J.S. ZONING & LAND PLANNING § 46 (2003) ("The control and regulation of density, as related to population or use of land, are proper considerations or factors in zoning, and zoning regulations which have their justification in the prevention of overcrowding of land and the avoidance of undue concentration of population bear a substantial relation to the public health, safety, morals, or general welfare, and are valid.").[11] The public interest in lower-density use and open space has obviously increased over time, as land development has flourished. *See generally* Cordes, *Property Rights and Land Use Controls*, 19 N. ILL. U.L.REV. at 643–45 (noting that public limits on property use necessarily correspond to changing social values and conditions). It should also be observed that the public interest in low-density use for the Property plainly increased during the substantial time period during which the landowner voluntarily operated it as a commercial golf course; the landowner's choice in this regard obviously impacted on the Township's growth planning, particularly as it is clear from the record that Upper Merion experienced tremendous pressure in this regard over the years. *See id.* at 653–54 (noting that unfairness concerns attendant to land regulation

11. The United States Supreme Court has explained:

> The concept of the public welfare is broad and inclusive. The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled.

*Berman v. Parker*, 348 U.S. 26, 33, 75 S.Ct. 98, 102–03, 99 L.Ed. 27 (1954) (citation omitted); *see also* 1 RATHKOPF's THE LAW OF ZONING AND PLANNING § 6.40 ("Open-space zoning, which limits the extent or density of development to preserve the visual character of an area or to implement growth management goals, is likely to be held a 'general welfare' type of restriction, which is designed to secure a widespread benefit.").

are tempered where the landowner is on notice that the property has attributes which would implicate potential regulation).

I do not discount the landowner's interests in the equation, which are amply developed by the majority.[12] Indeed, there are fairness elements involved that would suggest that the Township should consider alternatives reflecting a degree of compromise, for example, along the lines of the proposals from 1967 and 1981, or acquisition of development rights from the landowner for compensation, to the extent legally permitted. *See generally id.* at 650–51 (discussing purchase of development rights and transferable development rights programs). Nevertheless, in view of the public interests involved, as a matter of constitutional, substantive due process, I simply do not believe that Appellant has demonstrated the kind of arbitrary or unbalanced action on the part of the governing body such as would implicate judicial redress in the form of site specific relief predicated on the plans presented by Appellant in these proceedings.

As such, on this record, and in view of the supported findings of the Zoning Hearing Board, it is my considered view that deference is due here to the political branch. Accordingly, I respectfully dissent.

---

**12.** Certainly, the majority raises valid fairness concerns in the Township's treatment of the Property, most notably, in the rejection of the 1967 and 1981 proposals for commercial enhancements to the golf course. *See* Majority Opinion, 576 Pa. at 126-27, 838 A.2d at 725. I do not believe, however, that an appellate court has the ability to glean from such occurrences, particularly at the degree of abstraction in detail reflected in the majority opinion, unfairness as a matter of law on the order of manifestly arbitrary conduct, in derogation of the contrary judgment of the fact-finder. *Cf.* N.T., at 575 (testimony of John E. Rahenkamp) ("I don't know the reason it didn't go forward, whether it was ... the Acorn side, or whether it was the township side."); N.T., at 468–70 (discussing the reasons for the denial of the landowner's 1967 request for rezoning). Furthermore, such plans are not presently offered before the Court as alternatives justifying a claim of as-applied invalidity.