# Realen Valley Forge Greenes Associates v. Timoney

C.P. of Montgomery County, no. 05-09127.

*Thomas G. Wilkinson* and *Philip G. Kircher,* for plaintiff.

*Timothy T. Myers,* for defendants Timoney and Hankin Family Partnership et al.

*Herman Weinrich,* for third-party defendants Northwestern Mutual Life Insurance Company et al.

DRAYER, *J.,* December 22, 2009—The dispute between the parties involves the development of the Valley Forge Golf Course in Upper Merion Township, Pennsylvania. The Hankin Family Partnership[1] owned 135 acres of undeveloped land in Upper Merion Township, Montgomery County, Pennsylvania. Because the property was zoned "AG" under Upper Merion Township's zoning code, it has been used as the Valley Forge Golf Club. In June of 1996, the receiver entered into an agreement to sell the golf course property to Realen Valley Forge Greenes Associates[2] for $23,000,000 contingent upon Realen obtaining the right to develop it for commercial purposes, either through a rezoning or through a successful challenge to the validity of the existing agricultural zoning (1996 purchase agreement). This agreement was first amended in 1997 (1997 amended purchase agreement).

---

1. Hankin had been in receivership for many years. Thomas J. Timoney, Esq. is the receiver.

2. Realen is a Pennsylvania General Partnership whose partners are Realen Golf Communities L.P. and the Northwestern Mutual Life Insurance Company.

In 1997, Realen submitted to the Township Zoning Hearing Board a substantive challenge to the validity of the AG zoning of the golf course property that was opposed by the Upper Merion Board of Supervisors. In support of its challenge, Realen submitted two alternative site plans for the development of the golf course property. These plans have been generally known throughout this litigation as plan A and plan B. The ZHB rejected the Realen challenge in a decision dated August 13, 1999. Realen unsucessfully appealed the ZHB decision to the Court of Common Pleas of Montgomery County and to the Commonwealth Court.

In January of 2001, Realen, the receiver and Marc Kaplin, Esquire, counsel at that time for Realen, entered into a joint prosecution agreement under which Mr. Kaplin on behalf of Hankin and Realen was to prosecute additional causes of action in the state court under the Pennsylvania Eminent Domain Code and federal court under the Civil Rights Act (collectively, "additional actions"). In March and April of 2001, these additional actions were commenced.

On or about July 1, 2002, Realen told the receiver that it was unwilling to comply with the provisions of the existing purchase agreements to gain extensions to the agreement.

On July 3, 2002 Realen filed a petition for allocatur with the Supreme Court. Between July 2002 and May 2003 there were extensive negotiations relating to amending the 1997 purchase agreement.

On February 13, 2003, Realen and the receiver signed an amendment to the purchase agreements. On March 3,

2003, the receiver filed a petition asking this court, inter alia, to consider the amended agreement of sale that had been signed (receiver's petition).[3]

On April 11, 2003, the Pennsylvania Supreme Court granted allocatur to review the ZHB denial of the Realen challenge and the lower court decisions sustaining that denial. On May 8, 2003, after a hearing on the receiver's petition, Realen and the receiver executed the second amendment amending and fully restating the purchase agreement dated June 19, 1996 and the first amendment thereto executed in October 1997 (2003 second amended purchase agreement) and an amended and restated agreement concerning representation and joint prosecution (amended joint prosecution agreement). Like the 1996 and 1997 purchase agreements, the 2003 second amended purchase agreement contained provisions for Hankin to receive an additional purchase price.

In December of 2003, the Supreme Court issued a ruling in favor of Realen holding that the AG zoning of the golf course property was invalid and remanded the case to the Court of Common Pleas for implementation of the development of either plan A or plan B. *In re Appeal of Realen Valley Forge Greenes Associates,* 576 Pa. 115, 838 A.2d 718 (2003).

On June 4, 2004, before any final approvals in connection with the development had been obtained, Realen advised the receiver that they elected to close on the property on June 24, 2004. On June 24, 2004, Realen

3. The receiver also filed a supplemental petition on April 25, 2003.

closed on the property and paid the sum of $27,046,106.56 to Hankin.

In the fall of 2004, Realen and Mr. Kaplin took steps to stay the additional actions without the consent of the receiver. See exhibits P-91 throught P-94. On November 30, 2004, the receiver sent a letter to counsel for Realen objecting to the stays. In that letter, the receiver states:

"If it develops that the one-year period for measuring increased consideration to the sellers is measured not from the date of the issuance of original permits to Realen, but rather, from the date of settlement, in that improbable event we wish to make it clear that we are of the opinion that the stay of proceedings tolls the running of that one-year period." (Exhibit P-95.)

On December 9, 2004, counsel for Realen sent a letter to the receiver stating that Realen was within its authority to stay the additional actions with the township and that the time period for determining additional purchase price was running and would expire on June 24, 2005. On March 14, 2005, the receiver asked us to consider an order to lift stays and resolve disputes. Nothing was ever filed in connection with this request.

On March 18, 2005, Realen commenced this action against Hankin by filing a complaint for a declaratory judgment. The relief requested was to have us declare that:

"(a) Any additional purchase price under the purchase agreement[4] must be determined as of June 24, 2005;

---

4. 2003 second amended purchase agreement.

"(b) The determination of an amount of additional purchase price is limited to those aspects of the development of the golf course property for which final approvals have been obtained as of June 24, 2005;

"(c) If Realen does not obtain any final approvals by June 24, 2005, Realen will not be required to pay any additional compensation at that time nor at any time thereafter."

On March 21, 2006, Realen filed a motion to amend the complaint. On February 29, 2008, we granted leave to amend the complaint and the amended complaint was filed on April 9, 2008.

The amended complaint contained an additional request for relief:

"(d) Realen has the present right to settle the additional actions (United States District Court for Eastern District of Pennsylvania, docket no. 01-cv-l622 and Montgomery County Court of Common Pleas docket no. 01-6978) without payment of money by the Township to defendants without their consent and prior to paying additional purchase price, if any is found to be due."

## DISCUSSION

We first will consider the issues relating to the 2003 second amended purchase agreement and the payment of an additional purchase price. By order of June 1, 2005, we found that an ambiguity existed in sub-paragraph 2A(c) of the 2003 second amended purchase agreement in setting a deadline for determining if Realen would owe an "additional purchase price" to Hankin for higher density development of the property.

Sub-paragraph 2A(c) states that "It is contemplated that before the closing date occurs the purchaser [Realen] will have obtained final approvals for all aspects of the development that the purchaser will construct on the property." In fact, in June of 2004, Realen elected to complete the closing even though no final approvals for the development of the property had been obtained. By order of June 1, 2005, we found it was not clear how sub-paragraph 2A(c) operated to establish a deadline for determining the additional purchase price when no final approvals had been obtained prior to closing on the property. We then concluded that "extrinsic evidence of the parties' contract discussions and negotiations therefore is needed in order to determine whether sub-paragraph 2A(c) was to apply if the closing occurred prior to the issuance of any approvals."

Since the June 1, 2005 order, the parties conducted substantial discovery culminating in five days of hearings.

Before we can determine what the parties intended in the 2003 second amended purchase agreement regarding the payment of additional purchase price, we must start with the 1996 purchase agreements.[5] This agreement provided for an additional purchase price as defined in paragraph 2A(a):

---

5. There are two documents that are helpful in examining this question. First is exhibit P-120 which is a comparison of different language relating to closing that was ultimately set forth in paragraph 4E of the 2003 second amended purchase agreement. Second the parties submitted a "joint 'section 2A(c)' exhibit" which was a comparison of the changes to section 2A(c) from the 1996 purchase agreement through the 2003 second amended purchase agreement.

"(a) In addition to the purchase price, purchaser shall pay to seller, as the 'additional purchase price', an amount equal to the product of (i) the number of rentable square feet of 'building rentable area' (as hereinafter defined), in excess of 425,000 rentable square feet, located on the property on or before the 'closing date' (as hereinafter defined), multiplied by (ii) the 'square feet price' (as hereinafter defined). Additional purchase price shall not be payable in any event with respect to final approval(s) received after the closing date. Nothing in this agreement shall obligate purchaser to seek to obtain final approvals for building rentable area in excess of 425,000 square feet and purchaser shall have no duty to sell or to maximize the additional purchase price. . . .

"(c) The square foot price and additional purchase price shall be determined as of the date of receipt of the final approvals for the subject building rentable area. The additional purchase price, if applicable, shall be due at the closing date. . . ." (Exhibit D-4.)

The relevant part of paragraph 3 of the 1996 purchase agreement, the predecessor of paragraph 4(e) of the 2003 second amended purchase agreement, states:

"(3) *Closing.*

"(a) Closing shall occur at 10 a.m. local time on the date ('outside closing date') which is one year after the 'zoning application date' (as hereinafter defined).

"Closing may also occur at any time earlier than as set forth above on the date established by purchaser giving 15 days prior written notice by purchaser to seller, but in no event prior to December 31, 1996.

"The date of closing determined in accordance with the foregoing is referred to in this agreement as the 'closing date.'" (Exhibit P-120.)[6]

This very straightforward language in the 1996 purchase agreement makes it clear that in the circumstances we now have before us no additional purchase price would have been paid. Paragraph 2(A) states that no additional purchase price shall be payable in any event with respect to final approvals received after the closing date. In paragraph 3, Realen had the option to have an early closing whether or not any permits had been obtained. This paragraph then provides that the date of closing, including an early closing, is referred to in this agreement as the "closing date". If the terms of this agreement were still applicable, the "closing date" would have been June 24, 2004, and without question no additional purchase price would be owed.

Does the 2003 second amended purchase agreement change that result? Having determined an ambiguity in this agreement relating to the time period for calculating the additional purchase price, we now have to review the complicated negotiations that ended up in the 2003 second amended purchase agreement. The strict cutoff for determination of additional purchase price in the 1996 purchase agreement was the background against which the negotiations concerning the additional purchase price in the amended purchase agreement have to be considered.

On or about July 1, 2002, certain time limits were expiring and Realen advised the receiver that it was

---

6. This language remained the same in the 1997 amended purchase agreement.

unwilling to comply with the requirements under the 1997 amended purchase agreement to obtain extensions. The parties then began to negotiate a second amendment. Mr. Kaplin, as counsel for Realen, was the principal drafter of this second amendment and the negotiations for the most part went through Mr. Kaplin's office.

The first draft of the 2003 second amended purchase agreement was set forth in an email dated November 27, 2002 from Mr. Kaplin's firm to the receiver. In that draft, paragraph 2(A)(c) provided:

"(c) Additional purchase price shall be determined as of the date of receipt of the final approvals for the type of building that generates the additional purchase price. The additional purchase price, if applicable, shall be due at the closing date . . . . Additional purchase price shall not be payable in any event with respect to final approval(s) received after the closing date." Exhibit P-28.

Paragraph 4 of this draft provided:

"(4) *Closing.*

"(a) Closing shall occur at 10 a.m. local time on the date (closing date) which is 90 days after the purchaser has obtained all of the purchaser's approvals for the permitted uses. Closing may also occur at any time earlier than as set forth on the above date established by the purchaser giving seller 15 days prior written notice. . . ." Exhibit P-28.[7]

---

7. The only change to the language in paragraph 4(a) that ultimately became paragraph 4(e) the final 2003 second amended purchase agreement was the addition of "as defined in paragraph 5A(a)" im-

In this draft there were two possible closing dates: 90 days after Realen had obtained all the necessary purchaser's approvals; and an early closing as determined by Realen. Yet, Mr. Kaplin did not put in the critical language from the original agreement that the date of closing is the "closing date."

This first draft of the proposed 2003 amended purchase agreement raised some concerns in the Hankin family about the additional purchase price. Mitchell Hankin initiated an internal dialogue among the Hankin family members with a December 4, 2002 email that argued for expanding the time for determination of the additional purchase price, until five or more years after closing. He wrote:

"(7) par c. we need some protection. this par c. states 'additional purchase shall not be payable in any event with respect to final approvals received after the closing date.' possibly language that allows for an increase in purchase price five or more years after closing. there is also language to the effect that buyer need not try to maximize amount of development. we must protect ourselves." (Exhibit P-34 at D-260.)

Following that internal discussion, by email dated December 10, 2002, Mayor Shanken, on behalf of the Hankins, commented:

"(13) Page 10, para. 2A(c): The closing date cannot be the cut-off date for the additional purchase price. What if there is an accelerated closing date? What about pend-

---

mediately after purchaser's approvals. See exhibit P-46 as part of exhibit P-120.

ing applications or applications that you hold off filing, or amend shortly after closing to avoid paying the additional purchase price? Therefore, we suggest a cut-off date of 24 months after the closing date." (Exhibit P-36; N.T. 11/5/08 at 136-37; N.T. 11/6/08 at 162-65.)

Mr. Shanken sent a follow-up email on December 15, 2002 that reiterated Hankin's request. He wrote:

"(1) Item 13. The closing date as the cut-off date for calculating the additional purchase price. You understand our concerns, so suggest something that protects us." (Exhibit P-37; N.T. 11/5/08 at 138-40; N.T. 11/6/08 at 165.)

On January 14, 2003, Mr. Kaplin sent a revised draft of the amended purchase agreement to Mr. Shanken, Mark Hankin, and Realen representatives responding to Mr. Shanken's requests concerning the additional purchase price provision. (Exhibit P-40.) Paragraph 2A(c) of the revised draft provided in relevant part:

"(c) the dates for determining the amount of the additional purchase price, if any, shall be as follows: For aspects of the development for which final approvals are obtained by the closing date and which do not change within one year after the closing date the determination date shall be the closing date. For aspects of the development for which final approvals are obtained by the closing date and which change within one year after the closing date the determination date shall be the closing date, but such determination shall be adjusted on the one-year anniversary of the closing date. *For aspects of the development for which final approvals are not obtained by the closing date, the determination date shall*

*be one year after the date on which final approvals are obtained for such aspects of the development.*"[8] (Exhibit P-40 ¶2A (emphasis added); N.T. 11/5/08 at 144-45; see also, evolution of ¶2A(c), tab B, at section 4.)[9]

In several respects, this paragraph significantly changed the prior agreements relating to the additional purchase price. First is the removal of "additional purchase price shall not be payable in any event with respect to the final approvals received after the closing date."[10] Second is the insertion of the Kaplin proposed language that ties the determination of the amount of the additional purchase price to the dates when final approvals are issued if these final approvals have not been obtained by the closing date, rather than tying the date of determination to the closing date. Third is the introduction of the concept of "aspects of development."[11]

The Kaplin proposed language would have avoided any question about payment of the additional purchase price in the event of an early closing where no final approvals had been obtained. This language would require payment of an additional purchase price if the final ap-

---

8. This italicized language will be referred to in this opinion as "the Kaplin proposed language."

9. Interestingly, this draft was not sent to the receiver who was the party ultimately responsible for signing the agreement on behalf of the Hankins. This same draft was included with a January 17 email to Mr. Shanken and Mark Hankin with a copy to the receiver, although it does not appear to be redlined to highlight the italicized language. See also, evolution of ¶2A(c), tab B, at section 5.

10. It should be noted that this language was never added back to any subsequent draft of this agreement.

11. The "aspects of development" language remained in the final version of this agreement.

provals not obtained by the closing date resulted in excess development as provided in paragraph 2A(a), and the time for this determination would be one year after the final approvals were obtained. This determination was not tied in any way to closing date or the date of closing except that it referred to final approvals not obtained by the closing date.

Since Realen had not reviewed the draft containing the Kaplin proposed language, Mr. Kaplin's covering email reserved Realen's right to reject any of the proposed revisions. (N.T. 11/5/08 at 143; exhibit P-40.) Realen rejected the revisions to paragraph 2A(c)—specifically, the concept that with regard to final approvals not obtained by the closing date, the additional purchase price would be tied to the date on which the final approvals were received rather than the closing date. (N.T. 11/5/08 at 145, 147-49; exhibit P-43; N.T. 11/6/08 at 158-59, 166-67.)

Realen proposed the following revisions to paragraph 2A(c) of the January 14, 2003 draft:

"(c) the dates for determining the amount of the additional purchase price, if any, shall be as follows: For aspects of the development for which final approvals are obtained by the closing date ~~and which do not change within one year after the closing date~~ the determination date shall be the closing date. ~~For aspects of the development for which final approvals are obtained by the closing date and which change within one year after the closing date the initial determination date shall be the closing date, but such determination shall be adjusted on the one year anniversary of the closing date.~~ For aspects

of the development for which final approvals are not obtained by the closing date, the determination date shall be ~~one year~~ the earlier of (i) 30 days after the date on which final approvals are obtained for such aspects of the development or (ii) one year after the closing date." (Exhibit P-45 emphasis added;[12] N.T. 11/5/08 at 152-54; N.T. 11/6/08 at 168; see also, evolution of ¶2A(c), tab B, at section 7.)

Mr. Kaplin incorporated Realen's proposed revisions into a new draft that was circulated on February 6, 2003. (Exhibit P-48; N.T. 11/5/08 at 156; N.T. 11/6/08 at 169-70.) This draft provided in relevant part as follows:

"(c) the dates for determining the amount of the additional purchase price, if any, shall be as follows: For aspects of the development for which final approvals are obtained by the closing date the determination date shall be the closing date. *For aspects of the development for which final approvals are not obtained by the closing date, the determination date shall be the earlier of (i) 30 days after the date on which final approvals are obtained for such aspects of the development, or (ii) one year after the closing date.*" (Exhibit P-56 ¶2A (emphasis added); N.T. 11/5/08 at 159-60; N.T. 11/6/08 at 170-71.)

On February 11, 2003 a draft that had been signed by Realen with identical 2A(c) language was submitted to the receiver with the admonition that no further exten-

---

12. Throughout this opinion underlined text indicates proposed insertions; underlined and stricken-through text indicates proposed deletions.

sions would be granted. The receiver signed this agreement on February 13, 2003.

In response to this executed agreement, on February 21, 2003, Mark Hankin sent Realen a "marked-up" copy of the executed agreement that proposed further revisions to the language of paragraph 2A(c)

"(c) the dates for determining the amount of the additional purchase price, if any, shall be as follows: For aspects of the development for which final approvals are obtained by the closing date *and which change within one year after the closing date the determination date shall be the closing date, but such determination shall be adjusted on the one-year anniversary of the closing date,* ~~the determination shall be the closing date.~~ For aspects of the development for which final approvals are not obtained by the closing date, the determination date shall be ~~the earlier of (1) 30 days after the date on which final approvals are obtained for such aspects of the development or ii~~ one year after the closing date. *[we need this protection for obvious reasons, all of which were discussed with Dennis and we thought were agreed upon—this is the verbage from your prior draft.* [sic]" (Exhibit P-58 (emphasis in original); N.T. 11/5/08 at 165-67; N.T. 11/6/08 at 174-76; see N.T. 11/5/08 at 163; exhibit P-57; see also, evolution of ¶2A(c), tab B, at section 11.)

It is important to note that neither Mark Hankin's letter nor his revised draft attempted to restore the concept from the Kaplin proposed language that would tie the determination date for calculating the additional purchase price to the dates when the final approvals were issued and not to the date of closing.

Attached to the receiver's petition was exhibit H which is entitled summary of changes requested to the second amendment to the purchase agreement. Page 4 of exhibit H provides:

"On page 11, Realen has reneged on a previous understanding (which was reduced to writing in a draft submitted by Realen). This refers to the additional purchase price being payable with regard to any permit approvals obtained after the closing or which change after closing. Realen has substantially modified this provision so that there is no protection against Realen: (1) modifying a final approval beyond one year after the closing, or (2) holding off on a final approval for more than one year, in order to deprive seller of its entitlement to an additional purchase price."

This paragraph clearly reflects that the receiver and the other Hankins knew that Realen had rejected the Kaplin proposed language and the consequences of that rejection. This paragraph is a statement by the Hankins showing their clear understanding that final approvals received more than one year after closing would "deprive seller of its entitlement to an additional purchase price." Hankin in its post-hearing brief at p. 7 acknowledge that "[a]fter the allocatur, Hankin had considerable leverage." Yet, neither the receiver nor any of the Hankins ever attempted to have the Kaplin proposed language or any similar language added back to the 2003 second amended purchase agreement.

On March 19, 2003, Realen sent to Mr. Timoney a further revised draft amended purchase agreement. Paragraph 2A(c) of the March 19, 2003 revised draft ac-

cepted the substance of the proposed language from the Mark Hankin draft, only substituting the phrase "first anniversary of the closing date" for the phrase "one year after the closing date," and provided, in pertinent part, as follows:

"(c) the dates for determining the amount of the additional purchase price, if any, shall be as follows:

"(i) For aspects of the development for which final approvals are obtained by the closing date and which do not change within one year after the closing date, the determination date shall be the closing date.

"(ii) For aspects of the development for which final approvals are obtained by the closing date and which change within one year after the closing date, the initial determination date shall be the closing date, but such determination shall be adjusted on the first anniversary of the closing date.

"(iii) *For aspects of the development for which final approvals are not obtained by the closing date, the determination date shall be the first anniversary of the closing date.*" (Exhibit P-59 ¶2A (emphasis added); N.T. 11/5/08 at 167-71; N.T. 11/6/08 at 176-78; see also, evolution of ¶2A(c), tab B, at section 12.)

Realen thus accepted Hankin's request that the time for determination of additional purchase price would continue for a specified period of time after the closing date, and Realen acquiesced to the one year Hankin had requested. (N.T. 11/6/08 at 20.)

The record is clear that Realen and Hankin specifically bargained over the language setting forth the time

frame during which an additional purchase price would be determined. The concept of tying that time frame to the issuance of the final approvals, rather than to the closing date, was expressly raised in the Kaplin proposed language and was rejected by Realen. In spite of their leverage, the Hankins accepted Realen's rejection of that concept, and the parties ultimately settled after further negotiations on the language that was incorporated into paragraph 2A(c). That language tied the one-year period for determination of additional purchase price to the closing date, not to the time when final approvals were obtained. It is clear from these communications and Hankin's actions throughout this case that they knew that the date for closing on the purchase of the property would trigger the one-year period.

As we had earlier concluded, the language in paragraph 2A(c) was ambiguous. Since the language in the 1996 purchase agreement was clear that no additional purchase price was due for final approvals received after closing, Hankin needed to have clear language in the 2003 second amended purchase agreement to change that result. In our opinion, they did not do that. In the end, the only result of these extensive negotiations relating to additional purchase price was to extend the time for determination of the additional purchase price to one year after closing.

The ambiguity of 2003 second amended purchase agreement is confirmed by the receiver's letter of November 30, 2004 (exhibit P-95) which questions whether the one-year period for determining the additional purchase price had started to run from June 24, 2004, the

date of closing. If the receiver had that question on November 30, 2004, he should have had the same question in 2003 when the agreement was being negotiated. Again, since Hankin at that point had leverage because of the allocatur granted by the Supreme Court, Hankin should have insisted on more favorable language, such as the Kaplin proposed language.

Hankin argues that the changes made by Mr. Kaplin and the Hankins in drafting the 2003 second amended purchase agreement can be interpreted so that an additional purchase price is still due. A summary of the principal changes are the following:

• Paragraph 2A(a) providing "the closing date (hereinafter defined)"

• Paragraph 2.A(c) providing "It is contemplated that before the closing date occurs the purchaser will have obtained final approvals for all aspects of the development that the purchaser will construct on the property."

• Paragraph 2A(e) providing "it being understood that the intent of the concept of 'additional purchase price' is to compensate seller for a net increase in value . . . to purchaser from final approvals granted for higher density than the permitted uses."

• The removal from paragraph 2A(c) "additional purchase price shall not be payable in any event with respect to the final approval(s) received after the closing date."

• The adding of (as defined in paragraph 5A(a) hereof) to paragraph 4(e).

We agree that had the issue of the Kaplin proposed language not been negotiated and clearly rejected by

Realen, these other changes could possibly be interpreted to provide that an additional purchase price is still due. However, we also conclude that on close examination these changes do not in fact support Hankin's position. Even if they did, as we concluded above, Hankin failed to pursue the very clear solution in the Kaplin proposed language and therefore is barred from arguing that an additional purchase price is still due.

The principal argument that Hankin presents to show a contrary intent is that that the term "closing date" is a defined term and means "90 days after the purchaser has obtained all of the purchaser's approvals[13] (as defined in paragraph 5A(a) for the permitted uses)." See paragraph 4(e) of the 2003 second amended purchase agreement. Under this argument, the first anniversary of the closing date would be one year after this definition of "closing date," and since the purchaser's approvals were not received on the date of closing, the date to determine the additional purchase price has not yet occurred. While we agree that many of Mr. Kaplin's changes create confusion, we find that "closing date" as used in the 2003 second amended purchase agreement is the date on which closing occurred. Hankin's section 4(e) "closing date" interpretation *cannot* be reconciled with the use of "closing date" in nine other provisions of the amended purchase agreement.

It is clear that in each of those instances, the parties by their conduct have construed the closing date to be June 24, 2004—that is, the date on which the closing on

13. Subparagraph 2A(b)(iii) essentially equates "purchaser's approvals" with "final approvals."

the purchase of the property occurred. The parties have treated June 24, 2004 as the closing date for purposes of: (a) the date when the purchase price ceased to escalate in accordance with paragraph 2(a); (b) the date on which the purchase price was paid pursuant to paragraph 2(b); (c) the date as of which the seller made its representations and warranties under paragraph 8 concerning the status of the property; (d) the date on which the seller ceased to have responsibility under paragraph 9 to maintain the property; (e) the date on which the seller's responsibility to pay all real estate taxes for the property under paragraph 9(6) ceased; (f) the date when possession of the property was transferred from seller to purchaser under paragraph 11(a); (g) the date on which the seller delivered the closing documents provided for under paragraph 11(b) to the purchaser; (h) the date as of which the real estate taxes were apportioned pursuant to paragraph 12; and (i) the date up until which the seller was responsible to indemnify the purchaser for any environmental issues identified under paragraph 15(h).

Closing date cannot mean the date on which the closing on the purchase of the property occurred in nine out of 10 instances, but mean 90 days after all final approvals were obtained in the tenth instance. Rather, the term closing date must be read consistently throughout the amended purchase agreement.[14] Not only would Hankin's

---

14. See *Trombetta v. Raymond James Financial Services Inc.,* 907 A.2d 550, 560 (Pa. Super. 2006) ("Terms in one section of the contract, therefore, should never be interpreted in a manner which nullifies other terms in the same agreement"); *Capek v. DeVito,* 564 Pa. 267, 273-74, 767 A.2d 1047, 1050 (2001); see also, *Robert F. Felte Inc. v. White,* 451 Pa. 137, 144-45, 302 A.2d 347, 351 (1973).

construction of the term closing date in paragraph 2A(c) nullify other terms in the amended purchase agreement, it would nullify the same term closing date throughout the amended purchase agreement in every other place where that term appears.

The actions of Hankin after June 24, 2004 confirm that they understood the date of closing to be the closing date. To be consistent with their present position, the Hankins should have asserted that the escalation provisions were to continue, they would have continued possession of the property including receiving the rent and the maintenance responsibilities, they would have to continue to pay real estate taxes, etc. None of this happened after June 24, 2004. Nowhere in this record is there any evidence that the Hankins ever demanded from Realen the continued escalation. The first time that issue was addressed was in the testimony of Mark Hankin at the hearings before us. Mr. Hankin's testimony in this regard was not credible. Nor in this record is there any evidence that the Hankins had continued responsibility for the property.

A review of the Kaplin proposed language also shows that the parties understood that the date on which closing occurred and closing date were the same. Mr. Kaplin's language relates to final approval not obtained by closing date. If closing date is in fact 90 days after the purchaser has obtained all of the purchaser's approvals (final approvals), how could there be any final approvals not obtained by closing date?

While Hankin raises other arguments in its post-trial brief, we conclude that none of these arguments in and

of themselves or together change the result. In view of the foregoing, we conclude that the determination of additional purchase price under the 2003 second amended purchase agreement is to be made one year after the closing on the property that occurred on June 24, 2004.

During this proceeding we and counsel for the parties focused primarily the limited issue of determining the time period during which the additional purchase price was due and owing. However, the complaint for declaratory judgment also raises the issue of whether any additional purchase price is payable by Realen to Hankin. There was some testimony to the effect that plan A and/or plan B in fact exceeded the requirements set forth in paragraph 2A(a) of the 2003 second amended purchase agreement. The argument is that the decision of the Supreme Court in *In re Appeal of Realen Valley Forge Greenes Associates, supra,* effectively allowed Realen to develop plan A and plan B, and therefore to the extent these plans exceeded the requirements in paragraph 2A(a), an additional purchase price is due. We do not agree.

Additional purchase price is only due if final approvals are received by June 24, 2005, one year after the date of closing. Final approvals are defined in paragraph 2A(b)(iii) as "all matters, as hereinafter described in subsection 5A(a) hereof as 'purchaser's approvals', which will allow purchaser (or its successors) to immediately, lawfully develop, construct and operate the office buildings, retail buildings, hotels, residential units and all improvements associated therewith contemplated by such final approvals on the property." In paragraph 5A(a), purchaser's

approvals are defined as "all final, effective and unconditional court orders, zoning changes, subdivision approvals, land development approvals and all other final, effective and unconditional local, state and federal permits, licenses, authorizations, waivers and other permissions, including any private and quasi-governmental easements, rights of way and other authorizations . . . which will allow purchase on the closing date to immediately lawfully develop, construct and operate thereon the permitted uses."

We have already determined that the closing date was June 24, 2004. Did the Supreme Court in *In re Appeal of Realen Valley Forge Greenes Associates, supra,* give Realen the unconditional right to develop plan A or plan B on that date? We think not. The Supreme Court remanded the case to the Court of Common Pleas of Montgomery County for further proceedings consistent with its opinion and directed that Realen be afforded "definitive relief" as the successful challenger of the township's zoning ordinance. In making this ruling, the court refers to *Casey v. Zoning Hearing Board of Warwick Township,* 459 Pa. 219, 328 A.2d 464 (1974).

The Supreme Court in *Casey* specifically declined to direct the township to issue permits because the right to those permits was conditioned on other prior approvals that had not yet been given. The identical situation exists here. The court did not direct that Realen be granted final approvals as required by the 2003 second amended purchase agreement. Subject to the supervision of the Court of Common Pleas, Realen needed to proceed with the normal land development process to gain these final ap-

provals. Since Realen received no final approvals by June 24, 2005, no additional purchase price is due from Realen to Hankin under plan A or plan B.

We next will address the issue of whether Realen "has the present right to settle the additional actions (United States District Court for the Eastern District of Pennsylvania docket no. 01-cv-1622 and Montgomery County Court of Common Pleas docket no. 01-6978)" without the consent of the receiver. Amended complaint for declaratory judgment, CCP no. 05-09127, ad damnum clause ¶4 (filed April 9, 2008).

Realen indisputably can settle the additional actions under certain circumstances without the consent of the receiver. Paragraph 7 of the amended joint prosecution agreement sets forth the circumstances under which Realen unilaterally can settle the additional actions. See exhibit P-73 (also marked as exhibit D-110). After providing background information and explaining how the parties may diverge in the remedial relief sought, the second paragraph of sub-paragraph 7F states:

"Because of the foregoing potential conflict of interests, Kaplin required as a condition to instituting the additional actions on behalf of Hankin and Realen, and Realen required as a condition to agreeing to pay the cost of the additional actions that Timoney agree, on behalf of himself and Hankin, that if Realen determines, in its sole discretion, that it is desirable or prudent to settle either or both of the additional actions, Realen shall have the authority to cause Kaplin to settle either or both of the additional actions on behalf of Hankin and the consent

of Hankin and/or Timoney shall not be required; but only if *any such settlement shall entitle Realen to develop the property for the permitted uses (as defined in paragraph 5A(a) of the amended purchase agreement)*. Realen shall not have the right to cause the settlement of the additional actions in a manner that would not permit the development of the property for the permitted uses." (emphasis added)

Very simply, pursuant to this paragraph, Realen unilaterally can settle the additional actions with the township if the settlement is needed for the township to allow Realen to develop the property for the "permitted uses". "Permitted uses" are defined in paragraph 5A(a) of the 2003 second amended purchase agreement as follows:

"The permitted uses shall consist of:

"(i) a shopping center containing 425,000 square feet of rentable retail area, 642 residential units and 200 hotel guest rooms (or such lesser number as purchaser may determine in its sole and absolute discretion, subject, however, to the limitations provided in the last sentence of paragraph 5A(c) [sic], together with customary and ancillary improvements to the foregoing items; or

"(ii) a shopping center to contain 425,000 square feet of rentable retail area, 942 square feet of rentable office space and 200 hotel guest rooms (or such lesser number as purchaser may determine in its sole and absolute discretion, subject, however, to the limitations provided in the last sentence of paragraph 5A(c) [sic], together with customary and ancillary improvements to the foregoing items; or

"(iii) such other consideration of uses as is satisfactory to the purchaser subject, however, to the limitations provided in the last sentence of paragraph 5A(c)." [15]

Under this paragraph, "permitted uses" are separately defined in the disjunctive. Therefore, for purposes of the amended joint prosecution agreement, only one of the permitted uses needs to be approved by the township. It is equally noteworthy that Realen needs only to receive township approval to develop the property in accordance with one of the three options set forth as "permitted uses". Consents or permits may still be needed from other authorities, but Realen may only unilaterally settle the additional actions without the receiver's consent as a condition to obtaining township approval. On the other hand, if through an agreement with the township, Realen already possesses the ability to develop the property in accordance with one of these three permitted uses, Realen cannot unilaterally settle the additional actions.

We must now determine whether Realen already has the ability to develop the property for one of the "permitted uses". The answer to this question is contained in the settlement agreement regarding development of the Valley Forge golf course property executed between Realen and the township on April 20, 2006 (development agree-

---

15. The reference to the last sentence of paragraph 5A(c) is inadvertently inaccurate as the last sentence defines a previously unused term, namely "comparable value". It is believed that the reference really should be to the second to last sentence of paragraph 5A(c) which addresses the ability of the purchaser, namely Realen, to reduce the rentable retail area, number of residential units or number of hotel rooms. Whatever the proper reference, it is not relevant for purposes of the court's discussion interpreting sub-paragraph 7F.

ment). The development agreement was submitted by Realen as exhibit P-104 in this proceeding, and thus, is part of the record for our consideration.

Pursuant to the terms of the development agreement, Realen is entitled to develop the property in accordance with at least one, if not more, of the permitted uses. Paragraph 24 of the development agreement provides:

"Notwithstanding that Realen may not have caused the dismissal of the additional actions, for and in consideration of the commitment and release by Realen contained in paragraph 23, the township agrees that Realen shall have the right to commence construction of the town center pursuant to this [development] agreement, provided that the capacity of development of the property . . . shall not exceed the following unless and until the additional actions are dismissed with prejudice (the following being the "phase I of the town center"):

"(a) Up to 672 residential units;

"(b) Up to 300 hotel rooms;

"(c) Up to 425,220 square feet of net leasable area of commercial uses (excluding all space within a hotel).

"If Realen exercises the right contained in this paragraph to proceed with the town center and actually commences construction of phase I of the town center pursuant to a building permit issued upon a land development plan approved under this agreement, then Realen shall no longer be permitted to develop the property in accordance with either of the challenge plans. If after electing to construct phase I of the town center, the additional actions are dismissed with prejudice, Realen

shall then have the right to develop the property for the entire town center pursuant to the full capacity of development specified in paragraph 9. Because phase I of the town center does not exceed the capacity of development under the challenge plans permitted under the Supreme Court decision, the development of phase I of the town center pursuant to this agreement does not require the issuance of the order approving this agreement in order to proceed. Therefore, Realen may proceed with the development of the property up to the phase I capacity, including without limitation, submission and approval of land development plans and proceeding with construction of phase I of the town center pursuant to the terms of this agreement, *notwithstanding the fact that the order may not have been entered by the court. However, Realen may not proceed as of right with the development of the property with a capacity greater than the capacity of phase I of the town center unless the court order approving this agreement has been entered and the additional actions have been dismissed.*" See exhibit P-104 (unsigned order approving the attached and executed development agreement, ¶24). (emphasis added)

The approved development on the property is cryptically referred to as "phase I of the town center". As thereafter defined in paragraph 24, "phase I of the town center" consists of 672 residential units, 300 hotel rooms, and 425,500 square feet of net leasable commercial space. This is slightly more than the permitted uses described in sub-paragraph 5A(a)(i) of the 2003 second amended purchase agreement, which consisted of 642 residential units, 200 hotel rooms, and 425,000 square feet of rentable retail area. By the development agree-

ment, the township has approved a development on the property that exceeds sub-paragraph 5A(a)(i) with 30 more residential units, 100 more hotel rooms, and slightly greater net square footage of leasable area, which may be leased for more expansive commercial uses, rather than limited to mere retail usage.

Paragraph 24 concludes with the following: "Realen may not proceed as of right with the development of the property with a capacity greater than the capacity of phase I of the town center unless the court order approving this agreement has been entered *and the additional actions have been dismissed.*" (emphasis added) Thus, dismissing the additional actions would entitle Realen to develop the property in a manner that is greater than the standards set forth as permitted uses in subparagraphs 5A(a)(i) and (a)(ii) of the amended purchase agreement. Therefore we conclude that Realen may not settled the additional actions without the receiver's consent.

As a final matter, we need to address the effect of the court order issued on March 30, 2007 adopting the development agreement as an order of this court. See exhibit P-112 (order, CCP no. 99-16287 on remand from Pa.S.C., 186 MAP 2002 (Albright and Furber, J.J., dated Mar. 30, 2007)). Upon joint motion by Realen and the township, our colleagues in the Court of Common Pleas approved the development agreement and adopted it as an order of this court. The order explicitly provides that it did not and was not to "be construed to have any effect of the rights and remedies of the parties" in this declaratory judgment action or in the other additional actions. See exhibit P-112.

This order does not have any impact on this declaratory judgment action, our interpretation of paragraph 7F of the amended joint prosecution agreement, or Realen's rights to unilaterally settle the additional actions. In interpreting paragraph 7F of the amended joint prosecution agreement and determining that Realen has no right to settle the additional actions unilaterally, we have relied only upon the development agreement between Realen and the township dated April 20, 2006. The development agreement is independent of the court order adopting it.

Pursuant to the development agreement, a court order is necessary only in order to develop all of the town center land use plan. See exhibit P-104 (development agreement, ¶¶5, 24). "Realen may not proceed as of right with the development of the property with a capacity greater than the capacity of phase I of the town center unless the court order approving this agreement has been entered and the additional actions have been dismissed." See exhibit P-104 (development agreement, ¶24). The township, in paragraph 24 of the development agreement, acknowledges that court approval is not necessary in order to authorize development on the property of phase I of the town center: "Because phase I of the town center does not exceed the capacity of development under the challenge plans permitted under the Supreme Court decision, the development of phase I of the town center *pursuant to this agreement* does *not* require the issuance of the order approving this agreement in order to proceed." See exhibit P-104 (development agreement, ¶24). (emphasis added) See exhibit P-104 (development agreement ¶¶5, 24). It is the development of phase I of the

town center that we have determined is one of the "permitted uses" under paragraph 5A(a) of the amended purchase agreement. Because the development agreement permits this development on the property independent of the court's order of March 30, 2007, the issuance of the March 30, 2007 order has no effect on the rights and remedies of the parties in this declaratory judgment proceeding.

In view of the foregoing opinion, the following order is appropriate.

## ORDER

And now, December 21, 2009, after consideration of all the pleadings, the testimony and the briefs of counsel, it is hereby ordered and decreed that:

(1) Any additional purchase price under the 2003 second amended purchase agreement must be determined as of June 24, 2005;

(2) Since Realen did not obtain any final approvals by June 24, 2005, Realen is not required to pay Hankin an additional purchase price; and

(3) Realen does not have the present right under the amended joint prosecution agreement to settle the additional actions (United States District Court for Eastern District of Pennsylvania, docket no. 01-cv-1622 and Montgomery County Court of Common Pleas docket no. 01-6978) without the consent of the receiver.